James GUY, Plaintiff, Counterclaim Defendant–Appellee,

v.

SOUTHEASTERN IRON WORKERS' WELFARE FUND, Defendant, Counterclaim Plaintiff–Appellant.

No. 88–3036.

United States Court of Appeals, Eleventh Circuit.

July 11, 1989.

James T. Langford, Jacobs & Langford, Atlanta, Ga., for plaintiff, counterclaim defendant-appellee.

Frank M. Eidson, Griffin & Linder, Orlando, Fla., for defendant, counterclaim plaintiff-appellant.

Before VANCE and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

VANCE, Circuit Judge:

Appellee James Guy filed this declaratory judgment action in Florida state court seeking a determination of rights and damages arising from the withholding of medical benefits by the Southeastern Iron Workers' Welfare Fund ("SEIWF" or "Fund"). After removal to the district court, the Fund filed a counterclaim seeking reimbursement for $74,701.84 in medical expenses incurred by appellee's son Tommy. The district court ruled for appellee, concluding that the Fund's refusal to honor Guy's claims was arbitrary and capricious. Accordingly the court ordered the Fund to honor Guy's claims and enjoined the Fund from withholding future benefits. The court ruled for the Fund on its counterclaim, concluding that Guy had breached the subrogation agreement and ordered appellee to pay $74,701.84 to the Fund. SEIWF appeals from the judgment in favor of Guy on the claim for medical benefits.[1] For the reasons stated below, we affirm.

On January 19, 1984, appellee's son Tommy was seriously injured when an automobile struck his motorcycle. Tommy was sixteen years old and living with his mother, appellee's ex-wife, at the time of the accident. Appellee, a participant in the SEIWF, submitted claims to the Fund for Tommy's medical expenses. The Fund paid $74,595.13 in medical bills, constituting ap-

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Guy does not appeal from the judgment on the counterclaim.

proximately eighty per cent of Tommy's total expenses of $94,379.90.

Tommy's mother, Dona Guy, filed suit individually and on Tommy's behalf against the driver and the owner of the car involved in the accident. In addition, James Guy sued in his individual capacity. The parties entered into a structured settlement agreement whereby the defendants were to pay $500,000 to the plaintiffs and purchase an annuity worth approximately $2,130,000 to benefit Tommy. Of the $500,000, James Guy in his individual capacity received $15,-000, Dona Guy in her individual capacity received $50,000 and Tommy received $93,-000 to be set aside until he reached the age of majority. The remainder of the initial $500,000 payment was allotted for costs and attorneys' fees. Appellee used the $15,000 he received to pay part of Tommy's remaining medical expenses.

Approximately one month after Tommy's suit was filed, James Guy entered into a subrogation agreement with the Fund. The agreement provides that:

> To the extent that benefits for services are provided hereunder, the Southeastern Ironworkers Welfare Fund shall be subrogated and succeed to any rights of recovery of the covered persons because of such services against any person or organization, except insurers on policies of health insurance covering the covered persons. The covered persons shall pay over to the Southeastern Ironworkers Welfare Fund all amounts recovered by suit, settlement or otherwise from any third person or his insurer to the extent of benefits provided hereunder. The covered persons shall take such action, furnish such information and assistance, and execute such instruments as the Southeastern Ironworkers Welfare Fund may require to facilitate enforcement of its rights hereunder, and shall take no action prejudicing the rights and interests of the Southeastern Ironworkers Welfare Fund hereunder.

In the fall of 1985 Guy and his current wife experienced medical problems of their own and submitted claims totaling $4,316.81 to the Fund for payment. When the hospital sent bills to Guy notifying him that the Fund had refused to honor these claims, Guy contacted Roy Morgan, the third-party administrator of the plan. Morgan orally advised Guy that the Fund would not honor his claims until Guy reimbursed the Fund for the benefits paid on behalf of his son. The benefit plan stipulates that a participant whose claim has been either partially or entirely denied "will receive written notice within a reasonable period after receipt of the claim.... [giving] the specific reasons for the denial." The Fund, however, never provided Guy with a written explanation for its decision to withhold his benefits. Because a participant's right to appeal a denial of benefits is triggered by his receipt of written notification explaining the decision, Guy's right to appeal was effectively denied by the trustees' failure to provide written notice as required by the plan.

Guy filed this action on October 8, 1986. On March 2, 1987 the district court granted the Fund's motion to amend its answer to include a counterclaim seeking the $74,-595.13 to which it claimed it was entitled under the subrogation agreement. The court denied the Fund's motion to join the parties, plaintiffs' attorneys and insurance companies involved in Tommy's tort suit.

The Fund's principal contention on appeal is that the district court erred in concluding that the Fund's decision to withhold payment on Guy's claims was arbitrary and capricious. The SEIWF is a self-funded employee benefit plan regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (1982). Although ERISA does not set out the appropriate standard of review for actions challenging benefit determinations, the United States Supreme Court recently has ruled that review under the arbitrary and capricious standard in actions brought under § 1132(a)(1)(B) is appropriate when the plan's administrator exercises discretionary powers. *Firestone Tire & Rubber Co. v. Bruch*, — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Firestone*, the Court held that such actions must be reviewed de novo unless the plan expressly

gives the administrator discretionary authority to make eligibility determinations or to construe the plan's terms. If the plan does provide the administrator with such discretionary authority, application of the more deferential arbitrary and capricious standard is appropriate. *Id.*, 109 S.Ct. at 956.

 The Declaration of Trust of the SEIWF plan confers upon the trustees "full and exclusive authority to determine all questions of coverage and eligibility" and "full power to construe the provisions of [the] Trust...." In assessing Guy's contention that the Fund improperly denied him benefits, therefore, we must determine whether the district court's finding that the Fund's decision was arbitrary and capricious is clearly erroneous. *See, e.g., Musto v. American General Corp.*, 861 F.2d 897, 913 (6th Cir.1988) (applying clearly erroneous standard to review district court's finding of arbitrary and capricious conduct), *cert. denied*, — U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1093 (9th Cir.1985) (same). In applying the arbitrary and capricious standard, "this Court's role 'is limited to determining whether [the trustees'] interpretation was made rationally and in good faith—not whether it was right.'" *Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir.) (quoting *Griffis v. Delta Family–Care Disability*, 723 F.2d 822, 825 (11th Cir.), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984)), *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985). Factors taken into account include "(1) uniformity of construction; (2) 'fair reading' and reasonableness of that reading; and (3) unanticipated costs." *Id.* (quoting *Dennard v. Richards Group, Inc.*, 681 F.2d 306 (5th Cir.1982)).

Focusing primarily on the second of these factors, we conclude that the district court was not clearly erroneous in holding that the Fund's decision to deny Guy's medical benefits was arbitrary and capricious. Testimony at trial indicated that the trustees knew that Guy's claims were eligible for benefits under the plan but nevertheless declined to honor them pending the resolution of the subrogation dispute. The possibility that the dispute would be resolved in the Fund's favor, however, was at least uncertain.[2] It is a general principle of subrogation law that an insured who has settled with a third-party tortfeasor is liable to the insurer-subrogee only for the *excess* received over the total amount of his loss. *See* Couch on Insurance 2d 16 § 60.50 (1983). At the time Mr. Guy, the only party to the subrogation agreement with the Fund, received the $15,000 out of the settlement proceeds, Tommy's outstanding medical bills totaled $19,784.77. Tommy therefore had not been made whole and the Fund's right to subrogation was not mature.[3]

The Fund's claim for reimbursement for the entire amount of the benefits it paid out for Tommy's injuries was based solely on its contention that the court approved settlement agreement was structured to avoid the Fund's right to subrogation. The existence of an uncertain equitable theory of recovery does not constitute a reasonable basis for appropriating the medical benefits to which Mr. and Mrs. Guy were entitled without even affording them the required notice and right of appeal.

We recognize that there are possible exceptions to the general rule of subrogation law that might be asserted by an insurer in a case involving similar facts in an action against its insured. Given the existence of the general rule precluding subrogation in such a case, however, and in light of the Fund's failure to establish its qualification for an exception to the rule, we agree that the Fund did not have a facially valid right of subrogation compatible with the remedi-

---

2. Although the Fund ultimately prevailed on the counterclaim in the court below, Guy chose not to appeal from that judgment. Therefore the merits of the ruling on the counterclaim are not before us.

3. Tommy could not have paid the medical bills himself because he was to receive no part of the settlement until he reached eighteen years of age.

**40**

al principles of ERISA at the time it decided to withhold Guy's benefits.

We have considered the other issues raised by the Fund on appeal and conclude that the district court acted within its discretion in denying the Fund's motion for joinder and in awarding attorney's fees. Accordingly, the judgment of the district court is

AFFIRMED.