**Doug CAGLE, Adrian A. deVogel, Guy Dickenson, Don Hopkins, Henry Jenkins, and Lenore Miller, as Trustees and Fiduciaries of the Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund, Plaintiffs,**

v.

**Nancy M. BRUNER and Memorial Hospital Jacksonville, Inc.,[1] Defendants.**

No. 94–1015–Civ–J–16.

United States District Court, M.D. Florida, Jacksonville Division.

Nov. 17, 1995.

---

1. The Court, utterly in disbelief, was presented with Defendant Memorial Hospital's Motion To Correct, Amend And Substitute Parties on November 15, 1995 (Docket #67). Defendant Memorial Hospital asserts that on or about *May 31, 1995*, it merged with another corporate entity, Genesis Rehabilitation Hospital, Inc., and it now wishes, almost six months later, to substitute the ·former for the latter. The Court, at a loss as to why this motion was not made earlier, will grant the motion, and refer, when appropriate, to Defendant Memorial hereafter as Defendant Genesis Rehabilitation Hospital.

Cindy A. Laquidara, William Anspach, Laquidara & Edwards, Jacksonville, FL, Eugene S. Friedman, Friedman & Levine, New York City, for plaintiffs.

John F. Fannin, Fannin, Tyler & Hamilton, P.A., Jacksonville, FL, for Nancy M. Bruner.

Alan M. Fisher, Alan M. Fisher, P.A., Miami, FL, for defendant.

Wendy Ennis–Volcy, Alan M. Fisher, P.A., Miami, FL, for movant.

## ORDER AND OPINION

JOHN H. MOORE, II, Senior District Judge.

The above-styled cause is before the Court on several motions. Defendant Genesis Rehabilitation Hospital filed a Motion For Summary Judgment on August 15, 1995 (Docket # 21), and a Motion for Summary Judgment On Damages (And Against Cobbie Bruner, Sr. And Nancy Bruner) on August 21, 1995 (Docket # 27). On August 24, 1995, Defendant Nancy Bruner filed a Motion For Summary Judgment (Docket # 28). On September 1, 1995, Plaintiffs filed a Motion For Summary Judgment, and contemporaneously filed a Response to Defendants' Motions For Summary Judgment (Docket # 31). Defendant Genesis filed a Response To Plaintiff's Motion for Summary Judgment on September 18, 1995 (Docket # 38), and Defendant Bruner filed a Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment on September 21, 1995 (Docket # 39). Additionally, Plaintiffs filed a Motion To Permit The Possible Use Of Evidence Obtained After The Entry Of The Pretrial Statement on November 8, 1995 (Docket # 63). Defendant Genesis Hospital filed a response in opposition to said motion on November 13, 1995 (Docket # 66).

Upon due consideration, and an evaluation of the arguments and memoranda presented, the Court finds Defendant Genesis Hospital's Motion for Summary Judgment should be granted, Defendant Bruner's Motion for Summary Judgment Defendant should be granted in part, and denied in part, Defendant Genesis's Motion For Summary Judgment on Damages should be denied, Plaintiffs' Motion For Summary Judgment denied, and Plaintiffs' motion regarding the usage of evidence denied.

### I. Standard of Review

Summary judgment is proper where, upon motion of a party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245–46, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 584–85, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In making this determination, the Court must view all of the evidence in a light most favorable to the party opposing the motion and all justifiable inferences are to be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Anderson*, at 253, 106 S.Ct. at 2513; *Matsushita*, at 585, 106 S.Ct. at 1356. A party seeking summary judgment bears the burden of demonstrating by reference to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there is no genuine dispute as to any material fact. *Celotex*, at 323, 106 S.Ct. at 2553. However, the moving party need not produce evidence to disprove the opponent's claim. *Id.* Fed. R.Civ.P. 56 clearly provides that the moving party may move for summary judgment "with or without supporting affidavits." *Id.*

Once the moving party has sufficiently supported the motion, the party opposing summary judgment must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* The court shall then grant summary judgment only "if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson*, at 250, 106 S.Ct. at 2511. The question for the court is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* (citation omitted).

### II. Background Facts

#### A. Procedural History

Plaintiffs, the Trustees and Fiduciaries of the Retail, Wholesale and Department Store International Union and Industry Health and

Benefit Fund (hereinafter "the Fund", "Plaintiffs" or "Trustees"), filed this action on October 19, 1994 (Docket #1). On November 4, 1994, Defendant Genesis Rehabilitation Hospital, Inc. (hereinafter "Defendant Genesis") filed an Answer and Affirmative Defenses, and a Counterclaim against Plaintiffs (Docket #5). On December 9, 1994, Defendant Nancy Bruner filed an Answer And Counterclaim (Docket #6). On January 4, 1995, Plaintiffs filed a Reply to each of the Counterclaims filed by Defendants (Docket ##7, 8). Defendant Genesis filed an Amended Counterclaim For Damages, a Cross–Claim against Co–Defendant Nancy Bruner, and a Third Party Complaint against Ms. Bruner's husband, Mr. Cobbie Bruner, Sr. on June 6, 1995 (Docket #15).[2] To date, neither of the Bruners have filed responsive pleadings to Defendant Genesis's crossclaim and third-party claim. Hence, we are presented with a situation where a plaintiff filed a lawsuit against two co-defendants; the co-defendants filed counterclaims against the plaintiffs; and one co-defendant filed a cross-claim against the other co-defendant and a third-party complaint against co-defendant's husband.

### B. Factual Recitation

While the parties are essentially in agreement regarding the facts leading to this litigation, the Court will nevertheless, for purposes of completeness, engage in a brief recitation of the facts. This whole sad episode began on September 19, 1993, the day Cobbie Bruner, Jr., then seventeen (17) years old, was involved in an automobile accident. The automobile Cobbie, Jr. was riding in was struck by another vehicle driven by an individual not a party to this suit. Tragically, the injuries sustained in the accident rendered Cobbie, Jr. a quadriplegic. After the accident, Cobbie, Jr. was taken to University Medical Center, where he received emergency medical treatment.[3] On

October 18, 1993, Cobbie, Jr. was admitted to Memorial Hospital of Jacksonville, where he received medical and rehabilitative treatment, and remained there until February 18, 1994; the claims filed for this treatment exceed $184,000. Cobbie, Jr. also received treatment as an out-patient in Memorial Hospital from March 31, 1994 to September 27, 1994.

Defendant Nancy Bruner, the mother of Cobbie, Jr., is an employee of Swisher and Sons, and by virtue of her contribution throughout the years of her employment, is a "participant" under a self-funded health and medical benefits plan pursuant to ERISA. 29 U.S.C. § 1002(7). At the time of admission, Cobbie, Jr., was a dependant of his mother, and thus, covered as a "beneficiary" pursuant to the Plan. *Id.* at § 1002(8). The parties have agreed the Fund is an "employee benefit plan" and a "multiemployer plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3) and Section 3(37) of ERISA, 29 U.S.C. § 1002(37), respectively. The Fund provides health and welfare benefits to covered employees, retirees and their dependents by means of contributions made by employers. The Plan and the contributions were established pursuant to collective bargaining agreements between employers and the local unions affiliated with the Retail, Wholesale and Department Store International Union.

The day Cobbie, Jr. was admitted to Memorial Hospital, his father, Mr. Cobbie Bruner, Sr., signed a form assigning his son's rights with respect to the benefits he was receiving to Memorial Hospital. Shortly thereafter, Memorial Hospital obtained pre-certification from the Fund's certification agent, CARE Programs, certifying Cobbie, Jr. was an insured dependant and that an initial length of stay of one hundred and twenty three (123) days had been approved. Additionally, the certification stated that it

---

**2.** On September 11, 1995, Defendant Memorial Hospital filed a Motion to Amend Its Complaint by Interlineation as to Damages Only (Docket #36). U.S. Magistrate Judge Snyder entered an Order on October 26, 1995 (Docket #54) granted said motion "to the extent the wherefore clause of [Defendant Memorial's] Amended Complaint ... is amended to reflect demands for

judgment in the amount of $185,084.08 for in-patient bills and $7,875.00 for out-patient bills."

**3.** On October 10, 1995 (Docket #49) non-party University Medical Center filed a Verified Motion To Intervene. This Court denied that motion on November 3, 1995 (Docket #61).

was "not a guarantee of benefits or payments. Eligibility and benefits must be verified by the appropriate carrier or claims administrator." An initial claim of $296.00, representing a claim directly arising out of the accident, was processed and paid by the Fund.

However, on or about November 9, 1993, the Fund refused to pay or process any further claims of Cobbie Bruner, Jr. without a signed subrogation agreement provided by the Fund to Defendant Bruner. Defendant Bruner refused to sign the exact proposed agreement provided by the Fund, and instead, twice (on February 8, 1994 and July 28, 1994) opted to submit subrogation agreements with addenda attached, which Defendants claim are in compliance with the language of the Plan and its goal of protecting the Plan's rights under the Plan. Both attempts at submitting the amended subrogation forms were rejected by the Plan, arguing it would only accept the original, unaltered subrogation form initially submitted to Defendant Bruner. Without this original form being submitted, the Fund refuses to process or pay the claims submitted by Defendant Bruner.

In a letter dated September 15, 1994, counsel for Defendant Bruner wrote to the Fund requesting review of the denial of the claims made by Defendant Bruner. Michael Tamucci, Administrator of the Fund, responded on September 23, 1994, acknowledging receipt of the written request for review, and informed Defendant Bruner that the matter would be presented to the Trustees at their next meeting scheduled for November 4, 1994. The current lawsuit was instituted before the Trustees met and reviewed the Fund's denial of Defendant Bruner's claims.

Defendants Genesis and Bruner posit the Fund's unwillingness to accept the subrogation agreement with an addendum lies in the latter's desire to create a broader subrogation right than actually exists under the Plan. Defendant Bruner's insistence on the inclusion of the language in the addenda clearly is motivated by preventing such an outcome. Plaintiffs, conversely, argue the signing of an original and unaltered subrogation form is a prerequisite to the payment of any benefits,

and that their action is well within the powers of the Fund pursuant to the Trust Agreement and the Rules and Regulations promulgated thereunder.

### C. Relief Requested

#### 1. Complaint

Plaintiffs filed this action pursuant to § 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended 29 U.S.C. § 1132(a)(3), for declaratory and injunctive relief against Defendant Genesis Hospital and Defendant Bruner. Plaintiffs' first claim is against Defendant Genesis, and pursuant to 29 U.S.C. § 1132(a)(3) and 28 U.S.C. § 2201, seeks a declaratory judgment pronouncing that "the Fund shall not be required to process Bruner's claim for benefits unless and until the subrogation agreement provided by the fund to Bruner is executed without modification." (Compl. at 9.) Plaintiffs maintain Defendant Genesis's filing of the lawsuit "has and will interfere with the obligation of Plaintiffs to enforce duly established rules of the Fund respecting subrogation and the processing of benefit claims." (*Id.* at 7.) The second claim requests the Court enter an injunction compelling Defendant Bruner to execute the subrogation agreement without modification. Finally, Plaintiffs seek costs and attorneys' fees incurred by the Fund pursuant to 29 U.S.C. § 1132(g)(1).

#### 2. Counterclaims

Defendant Genesis's Amended Counterclaim contains four (4) counts, and are styled as follows: I. "Breach Of Contract/Verification Of Benefits/Estoppel"; II. "Breach Of Contract/Assignment Of Benefits/Estoppel"; III. Breach Of Fiduciary Duty; and IV. Declaratory Action. Defendant Genesis, aside from seeking a determination of its rights under the Plan with respect to the subrogation agreement, seeks payment for the medical treatment provided to Cobbie, Jr. from the Fund. Defendant Bruner's Counterclaim (and motion for summary judgment) asks for the following relief: 1) a declaration that under the Plan the rights of Defendant Bruner and her son "are such that the injured beneficiary is entitled to be made whole before the [Fund] may participate in a

recovery, if any, from an at-fault party"; 2) a judgment on behalf of Defendant Bruner against the Fund for the amount currently due for covered medical expenses; and 3) expenses and attorneys' fees incurred in defending the action and in pursuing her counterclaim. (Answer and Countercl. of Def. Bruner at 10–11.)

### 3. Motions for Summary Judgment

The Fund moves for summary judgment against: 1) Defendant Nancy Bruner, seeking an injunction compelling her to execute, without modification, "the standard subrogation agreement provided by the Fund to Bruner as a condition for the Fund's payment of benefits on behalf of [Cobbie Bruner]"; 2) Defendant Nancy Bruner, with respect to her counterclaim; 3) Genesis Hospital, asking for a declaration "that the Fund shall not be required to process Bruner's claim for benefits unless and until the standard subrogation agreement ... is executed without modification"; and 4) Genesis Hospital on its counterclaim. (Pl.'s Mot.Summ.J. at 1–2.) Defendants' motions for summary judgment posit that, as a matter of law, they are entitled to what they pray for in their counterclaims.

### III. Discussion

#### A. Standard of Review

As a preliminary matter, the Court must address and decide the important issue regarding the standard of review that must be employed in deciding the motions for summary judgment currently at bar. This threshold determination is vital, for the conclusion necessarily affects how the Court reviews the actions undertaken by the Trustees.

It is well-settled that the review of a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) must be "reviewed under a *de novo* standard unless the *benefit plan* gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (second italics added). If a *de novo* standard is not warranted, the decision will be reviewed under an "arbi-

trary and capricious" review. This principle exists within the Eleventh Circuit as well, in that it has "interpreted *Bruch* to mandate *de novo* review unless the plan expressly provides the administrator discretionary authority to make eligibility determinations or construe the plan's terms." *Kirwan v. Marriott Corp.,* 10 F.3d 784, 788 (11th Cir.1994).

Defendants Bruner and Genesis Hospital both argue the Fund's actions must be reviewed under a *de novo* review, rather than the more deferential "arbitrary and capricious" standard of review. Defendants maintain a heightened review is justified because: 1) a *de novo* review is appropriate when, as is the case here, there is no express grant of discretionary authority on the Plan's administrators; 2) the Summary Plan Description, rather than the Trust Agreement or the Rules and Regulations, controls; 3) of the Fund's alleged conflict of interest; and 4) of the Fund's failure to comply with its own administrative claims review procedure, thus constituting a waiver on Plaintiffs' part from having the Court review the case under an arbitrary and capricious standard.

Specifically, Defendant Bruner contends the Fund erroneously relies on the language contained within the Agreement and Declaration of Trust, which it argues, is not a "benefits plan." Rather, Defendant Bruner contends, the provisions of "the Summary Plan Booklet ... are controlling in this case vis-a-vis the Trust Agreement or the Rules and Regulations." (Def. Bruner's Mot.Summ.J. at 4 n. 1.) Defendant Bruner notes the Fund fails to point to any language contained within the Plan expressly granting discretionary authority on the Trustees. As such, Defendant Bruner maintains, since what she characterizes to be "the plan", i.e., the Summary Plan Description (hereinafter "SPD"), contains no specific and express granting of discretion upon the administrators, a *de novo* review should apply.

Similarly, Defendant Genesis Hospital avers the Fund "violated provisions of the *plan (summary plan description)....*" (Def.Mem.Hosp.'s Mot.Summ.J. at 7.) (emphasis added). Defendant Genesis complains that despite its repeated requests, before

discovery neither it nor Defendant Bruner received any document identified as being the "plan", with the exception for the Summary Plan Description; only during discovery did the Fund forward a copy of what the Fund insists is the "plan". Defendant Genesis Hospital also proffers the argument that the SPD is controlling for purposes of determining whether an express grant of discretion has been bestowed on the Trustees.

Conversely, Plaintiffs assert the more deferential "arbitrary and capricious" review should be implemented. Plaintiffs—in support of their motion for summary judgment, and in response to Defendants' arguments in support of their motions—also rely on the principle enunciated in *Bruch.* However, Plaintiffs rely on the language contained in the Trust Agreement and in the Rules and Regulations, and argue the U.S. Supreme Court in *Bruch,* when it determined which documents granted powers to the trustees, focused on the terms of the trust and the trust agreement itself. Plaintiffs further argue other courts adhering to *Bruch* have similarly examined the "trust documents underlying a benefit fund, particularly the foundational trust agreement, to gauge the level of discretion conferred to trustees." (Pl.'s Mot.Summ.J. at 5.) See e.g., *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176 (3d Cir.1991) (where the court focused on the original "Declaration of Trust"); *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989) (same). Since the Declaration of Trust and the Rules and Regulations expressly give the Trustees what is required under *Bruch,* Plaintiffs aver, the arbitrary and capricious standard should be utilized. Hence, the question arises: what document should the Court look to in determining what exactly is the "the plan": the SPD, the Rules and Regulations, and/or the Trust Agreement?

In response to Plaintiffs' motion for summary judgment, Defendant Genesis Hospital downplays the aforementioned arguments, perhaps by necessity, maintaining that all it and Defendant Bruner had in their possession was the SPD, not the Trust Agreement and Rules, and, as such, the SPD should provide the basis for the Court's analysis in its attempt to determine the extent of the Trustee's powers.

 Defendants have failed to satisfactorily persuade the Court the SPD alone should be relied on as being the instrument or document that controls. The Court feels the sensible approach in this case would be to apply *Bruch* and its progeny to warrant the conclusion that the Trust Agreement and the Rules and Regulations, for purposes of a Court trying to determine the Trustees' powers, should control. If deemed to be controlling, then a reading of the Trust Agreement, in conjunction with the Rules and Regulations, appears to reveal the Trustees indeed have the discretion necessary to trigger the arbitrary and capricious standard.

The arbitrary and capricious standard has been applied in this Circuit when a plan provides that the administrators determinations shall be final and conclusive provided they are reasonable determinations which are not arbitrary and capricious. See *Kirwan,* 10 F.3d at 788; *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). It has also been applied when the "plan confers upon the administrator 'full and exclusive authority to determine all questions of coverage and eligibility' and 'full power to construe the provision' of the plan. *Kirwan,* 10 F.3d at 788 (quoting *Guy,* 877 F.2d at 38–39).

Plaintiffs direct the Court to Article VI, §§ 4–5 of the Trust Agreement, which state:

> *Section 4.* ELIGIBILITY REQUIREMENTS FOR BENEFITS. The Trustees shall have *full authority to determine eligibility requirements for benefits* and to adopt Rules and Regulations setting forth same *which shall be binding* on the employees, their families and dependents.

> *Section 5.* METHOD OF PROVIDING BENEFITS. The benefits shall be provided and maintained *by such means as the Trustees shall in their sole discretion determine.*

(emphasis added). Plaintiffs also steer the Court to Section 8.11 of the Rules and Regu-

lations, entitled "Determinations Under Plan", which provides:

> The determination of any questions arising in connection with the Plan, *including (but not limited to) the interpretation of the terms of the Plan, shall rest with the Trustees, and their decision or action as to any such questions shall be final and conclusive, and binding* upon the Employers and any Employee, Dependant or Beneficiary.

(emphasis added). Again, if working on the assumption that the language found in the Trust Agreement and the Rules govern, it seems clear, given the language related above, the Trustees have been given an express authority to construe the terms of the Plan. As the italicized portions above demonstrate, the Trust Agreement grants the Trustees the power to determine both the eligibility requirements for benefits and the means by which they are provided. (See §§ 4–5 of the Trust Agreement.) Moreover, § 4 of the Trust Agreement empowers the Trustees to create Rules and Regulations setting forth binding requirements and rules regarding benefit eligibility. In the Rules, questions or interpretations under the plan lie exclusively and finally within the domain of the Trustees. The Court agrees with Plaintiffs that the language is similar to the language relied on in other cases finding an express grant of discretionary authority on the Trustees. Furthermore, the Rules and Regulations defines the term "Plan" or "Benefit Fund" as being "the Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund Rules and Regulations established by the Trustees pursuant to the Agreement and Declaration of Trust and as amended from time to time." (Rules and Regulations § 1.20 at 8.) Thus, the Court—concluding the Trustees have been empowered with the discretionary authority to determine eligibility for benefits and to construe the terms of the Plan—finds that an arbitrary and capricious review is justified.

### 1. Conflict of Interest

Defendant Genesis asserts since the Fund is self-funded, and the Trustees simultaneously administer and pay for the benefits under the Plan directly from the Fund, there is an inherent conflict of interest. Specifically, Defendant Genesis contends this conflict of interest, that is, Plaintiffs acting as both the fiduciary determining benefits and as payor of said benefits, calls for a heightened scrutiny, i.e., a *de novo* review. Defendant Bruner does not present this argument.

 In response, Plaintiffs argue the Fund in question is not the kind of entity courts have been concerned about as having conflicting interests, such as insurance companies. Specifically, Plaintiffs note the Fund is a nonprofit, multiemployer plan. Moreover, unlike an insurance company—that "pays out to beneficiaries from its own assets rather than the assets of the trust, [and thus] its fiduciary role lies in perpetual conflict with its profit making role as a business[,]" *Brown,* 898 F.2d at 1561—none of the Trustees in this matter have a personal interest when benefits are provided to beneficiaries since the Trustees serve as administrators of a pool of monies funded by various employer contributions. The Court agrees, and rejects Defendant Genesis's motion to apply a heightened scrutiny due to a conflict of interest.

### 2. Administrative appeals process

 In countering Defendant Genesis's argument that the Fund failed to act uniformly by adhering to its own appeals process, Plaintiffs point out Defendant Bruner failed to timely request a review of the Fund's decision. The SPD contains a claim review procedure, whereby denials of claims can be appealed within sixty (60) days after the claimant has received written notice of the denial. See SPD at 45–46. To the extent Defendants ask the Court to apply a heightened standard due to the Fund's failure to comply with its administrative appeals process, the Court, finding Defendant Bruner was indeed untimely in her appeal to the Trustees, (see Pl.s' Mot.Summ.J. at 10–11 n. 6), will deny the motion.

### B. Disputed Jurisdiction–Standing

In a footnote, Plaintiffs argue the Counterclaim filed by Defendant Genesis does not lie

within the jurisdiction created by ERISA. Specifically, Plaintiffs argue Defendant Genesis lacks standing in its counterclaim action because a beneficiary (Defendant Bruner) cannot assign to a health care provider (Genesis) a right to proceed in federal court to sue under an ERISA plan. Should the Court find Defendant Genesis has standing, Plaintiffs alternatively argue, then Defendant Bruner is divested of standing, since she assigned away her rights to file suit. The Court is not persuaded by Plaintiffs' contentions.

The U.S. Court of Appeals for the Eleventh Circuit has yet to directly confront the issue of whether a provider of medical services may file suit against an insurer as an assignee of a beneficiary. However, in *Miami Children's Hospital, Inc. v. Malakoff*, 765 F.Supp. 718 (S.D.Fla.1991) (Hoeveler), the court, adopting the reasoning of other Circuits addressing the issue,[4] held a provider of medical benefits, after an assignment by the beneficiary, had standing to sue under ERISA. *Id.* at 720. The Court finds Judge Hoeveler's reasoning persuasive, and further finds a provider of medical benefits, as an assignee of benefits, has standing to sue in federal court. Hence, the Court finds Plaintiffs' argument and alternative argument on standing should be denied.

### C. Preemption

In another footnote in their summary judgment motion, Plaintiffs assert Defendant Bruner's counterclaims rely on state common law and hence, are misplaced since the claims are preempted by ERISA. The Court finds Defendant Bruner's claims, for injunctive and declaratory relief, are not preempted. See discussion, *infra*, pp. 739–740.

Similarly, Plaintiffs argue Defendant Genesis's counterclaims "appear to be based exclusively on state common law theories, e.g., breach of contract, promissory estoppel and breach of fiduciary duty[,]" and therefore are also preempted under ERISA. In response, Defendant Genesis, cites to, among other

cases, *National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta*, 929 F.2d 1558, 1571–72 (11th Cir.1991) and *Kane v. Aetna Life Insurance Co.*, 893 F.2d 1283, 1286 (11th Cir.), *cert. denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990), and asserts when an employee detrimentally relies on an interpretation of a plan by its representative, a federal common law claim of equitable estoppel may lie. While this broad-sweeping assertion may be correct, the Court finds it is inapplicable in this case.

State common law claims relating to employee benefit plans, such as equitable estoppel, are preempted by ERISA. See 29 U.S.C. § 1144(a); *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Federal courts, however, are empowered to "develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." *Kane*, 893 F.2d at 1285 (citing *Pilot* at 54, 107 S.Ct. at 1557). In *Nachwalter v. Christie*, 805 F.2d 956 (11th Cir.1986), the Eleventh Circuit, also noting state common law claims such as estoppel are preempted, held there was no federal common law right to promissory estoppel under ERISA involving oral amendments to or modifications of ERISA-governed employee plans because ERISA explicitly addresses these issues. *Nachwalter*, 805 F.2d at 960.

In *Kane*, however, the court recognized a distinction between oral amendments or modifications on the one hand, and oral interpretations of a plan, on the other. *Kane*, 893 F.2d at 1285. The court held a federal common law claim of equitable estoppel may lie when: "(a) the provisions of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning or effect, and (b) representations are made to the employee involving an oral interpretation of the plan." *Alday v. Container Corporation of America*, 906 F.2d 660, 666 (11th Cir.1990) (citing *Kane*, 893 F.2d at 1285–85). Expressed differently, the holding stands for the proposition that "the federal

---

4. See, e.g., *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698, 700–01 (7th Cir. 1991); *Hermann Hospital v. MEBA Medical &* *Benefits Plan*, 845 F.2d 1286, 1289 (5th Cir. 1988).

common law claim of equitable estoppel may be applied when an employee relies, to his detriment, on an interpretation of an ambiguous provision in a plan by a representative of that plan." *National Companies*, 929 F.2d at 1571–72. The rationale of *Kane* "is equally applicable to informal written interpretations of an ERISA plan." *Id.* at 1572. With the aforementioned body of law in mind, the Court, after a review of its Amended Counterclaim, finds Defendant Hospital's state law claims are preempted by ERISA.

### D. Subrogation

■■■ Having concluded *ante* that the arbitrary and capricious standard should apply, the Court will now examine the Trustees' decision and determine "whether the contested interpretation was made rationally and in good faith." *Blank v. Bethlehem Steel Corp.*, 926 F.2d 1090, 1093 (11th Cir.), *cert. denied*, 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *Guy*, 877 F.2d at 39. A court, in making this determination, must consider "the uniformity of the [Fund's] construction, the reasonableness of its interpretation and possible concerns with the way unexpected costs may affect the future financial health of the plan." *Blank*, 926 F.2d at 1093. Moreover, an administrator's good faith can be demonstrated by: "(1) internal consistency of a plan under the interpretation given by the administrators or trustees; (2) relevant regulations formulated by the appropriate administrative agencies; and (3) factual background of the determination by a plan and inference of good faith, if any." *Id.*, *quoting Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir.), *reh'g denied*, 767 F.2d 938, *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985).

### 1. Uniformity of Construction

Plaintiffs submitted for the Court's consideration the affidavit of Mr. Tamucci in support of its view, and in rebuttal of Defendants' assertions, that the Fund has been consistent in: using the same agreement for at least ten (10) years (Tamucci Dep. at 30); not accepting an altered agreement (*id.* 33–34); and in enforcing its policy of requiring a signed subrogation agreement, *when charac-* *terized as being necessary*, prior to the payment of any benefits (*id.* at 9–10, 29–30).

■■■ Based on the deposition of Mr. Tamucci, it appears the requirement that a subrogation form be signed often is a function of the amount of the claim. Since there is no fixed amount of money triggering the requirement of a subrogation agreement (*id.* at 122), it seems the higher the claim, the more likely the necessity of the form. Moreover, if it appears the funds can be collected voluntarily, without recourse to the courts and attorneys, then an agreement is unnecessary. (*Id.* at 127). Thus, to the extent mentioned above, it seems the Fund has been inconsistent in its application of its policy requiring a signed subrogation agreement. The Court, however, finds this alone does not amount to arbitrary and capricious action.

### 2. Reasonableness of Interpretation

The second factor, and perhaps the most important in this case, is the determination of whether the Trustees' interpretation is consistent with a "fair reading" of the Plan. *Guy*, 877 F.2d at 39. The issue ascending to the forefront of this case is the scope of the Fund's subrogation rights, and this issue is implicated only because of the Fund's position that the subrogation form be signed before any benefits are granted, and Defendants' converse argument that the proffered subrogation agreement, without modification, impermissibly expands on the Fund's subrogation rights.

More specifically, Plaintiffs allege the Fund is entitled, as a condition precedent to payment of medical claims, to have Defendant Bruner execute the subrogation agreement in an unaltered form. Plaintiffs aver the subrogation agreement in question, always required in the event of significant accident claims, has been used for many years, and has never been accepted in a modified manner. Plaintiffs further argue the SPD provides the Fund "is entitled to be reimbursed not merely from a recovery specifically identified as being for medical expenses, but rather from *any* recovery, up to the *amount* of medical expenses paid by the Fund." (Pl.s' Mot.Summ.J. at 12–13.)

Defendant Bruner argues the subrogation agreement impermissibly expands the subrogation rights of the Fund beyond what the Plan provides. As phrased in her Counterclaim, the Fund's attempt to include the "in full" language contravenes the established law giving the beneficiary the right to be "entitled to full compensation and recovery from the at-fault party *before* the benefit Fund would be able to recoup payment by subrogation." (Def. Bruner's Countercl. at p. 9, ¶ 8.) Along the same vein, Defendant Genesis argues while the subrogation provision of the SPD seeks repayment in the event of a recovery of the amount of medical expense paid, the subrogation agreement's clause "attempts to lay claim to any and all third-party recovery in contravention of the [SPD] which clearly seek only repayment of medical expenses." (Def.Mem.'s Mot. Summ.J. at 19.)

Defendants argue the language of the SPD itself warrants a finding that the payment of medical benefits is a condition precedent to the Fund's subrogation rights. Specifically, they emphasize the clause which provides the Fund has the right to seek "repayment" from a third party tortfeasor or his insurance company, or in the case of settlement, the Fund through subrogation can be "reimbursed" to recover the amount of medical expense "paid by the Fund". The inclusion of these terms, Defendants assert, presupposes payments have already been made, and compels the conclusion that the payment of benefits must necessarily come before the subrogation rights of the Fund attach; as played out in this situation, therefore, the Fund should process the claim, pay for the medical expenses, and then seek to enforce its unquestioned subrogation rights. As such, Defendants conclude, the Fund has impermissibly withheld payment of the benefits pending the signing of the subrogation agreement. But why is the Fund refusing to make the payments and insist on the signing of the agreement when the Plan itself provides for subrogation? The reason, Defendants maintain, can be found in the language of the subrogation agreement itself, and its attempt to "create a broader subrogation right than actually exists under the Plan." (Def.Mem.'s Mot. Summ.J. at 19.)

The parties' respective concerns regarding the scope of the Fund's subrogation rights, and the language in the SPD and subrogation agreement, is understandable. For example, for purposes of illustration, suppose Defendant Bruner files an action against the alleged tortfeasor, which, the Court is informed, is very likely to occur. After the case is filed, but before a finder of fact decides on a verdict, the parties agree to a settlement. The settlement agreement provides the at-fault tortfeasor, covered by his insurance policy, shall give Ms. Bruner $200,000 for pain and suffering; significantly, the settlement agreement is crafted to omit any mention of medical damages being factored in the final settlement figure.

In this hypothetical, if Defendant Bruner were compelled to sign the agreement without any modification, the Fund would argue that pursuant to its subrogation rights, it can receive the money the Fund *actually expended* for medical benefits; in this situation, the Fund will argue it is entitled to *all* of the $200,000 the participant/beneficiary received in this settlement. Thus, the Bruners want to include an addendum presumably to limit the Fund's ability to get the whole $200,000, *unconditionally*. Phrased differently, Defendants argue the Fund is attempting to have Bruner sign an agreement broader than what is provided in the SPD and the Rules and Regulations.

Conversely, if the language contained in the SPD controlled, and we accept the Defendants' interpretation allowing for recovery of medical expenses only, the Fund maintains the settlement agreement providing for pain and suffering exclusively would severely undercut its interest, indeed its duty, in keeping the Fund perpetually solvent. If such an undifferentiated recovery occurred, then the Fund would not receive a penny of their outlay. Another hypothetical would involve a jury awarding $150,000 for medical damages and $500,000 for pain and suffering. According to the subrogation agreement, without modification, the Fund would argue it is allowed to recover the $150,000 for medical damages allocated, plus dig in and recover the remaining $50,000 from the pain and

suffering allocation, since the agreement states the Fund is to be reimbursed *in full,* and subrogated accordingly. In this scenario, Defendants would insist the Fund is entitled to the $150,000 that was specifically awarded for medical costs, and nothing else.

■ Thus, we are presented with a conflict between the language of the agreement the Fund insists be signed, before benefits are paid, in an unaltered manner, versus the language of the SPD (and that of the Regulations) that can be interpreted to be read as providing for the recovery of medical benefits only. The question, then, is whether the Fund's interpretation of the subrogation agreement—i.e., that it be allowed to *unconditionally* recover the total amount of medical costs they expended, and its insistence to have the subrogation agreement signed without any alteration—is based on a fair and reasonable reading of the terms of the Plan. The Court finds that it is not.

First, the Court will evaluate the reasonableness of the Trustees' construction of the subrogation provisions of the Plan and the contested subrogation agreement. That the Fund has subrogation rights is not disputed. The section describing subrogation in the SPD [5] states, in full:

Subrogation seeks to conserve the assets of the Benefit Fund by imposing the expense of accidental injuries suffered by members or eligible dependent's [sic] on those responsible for causing them. If you or one of your dependents, for example, should receive benefits from the Fund for injuries caused by someone else (such as an automobile accident), *the Benefit Fund through subrogation has the right to seek repayment from the other party or his insurance company, or in the event you or your dependant recovers the amount of medical expense paid by the Fund by suit, settlement or otherwise from any third person or his insurer, the Fund has the right to be reimbursed therefor through subrogation.*

The Benefit Fund will provide benefits to you and your dependents at the time of need, *but you may be asked to execute documents or to take such other action as is necessary to assure the rights of the Fund.*

(emphasis added). Equally indisputable is that Defendants timely filed claims on behalf of an eligible and covered dependent under the Plan.

The proposed subrogation agreement provides, in relevant part:

I (we) understand that if payments are made under the Plan for any treatment or services because of injury to, or sickness of, an eligible individual who has a lawful claim, demand or right against a third party or parties (including an insurance carrier) for indemnification, damages or other payment with respect to such injury or sickness, I (we) am (are) required to subrogate to the RWDSU Health and Welfare Fund, the Plan, to the extent of payments made under said Plan, my (our) rights to receive or claim such indemnification, damages or other payment.

In consideration thereof, if payments are made under said Plan for treatment or service on account of the same injury or sickness and to the extent of such payments are made (but not in excess of the proceeds of any recovery),

(a) I (we) agree *to reimburse the Plan in full* from the proceeds of *any recovery received* by me (us) because of such injury or sickness, and

(b) The Plan *shall be subrogated in full* to my (our) rights to such recovery and my (our) interest in the proceeds of such recovery;

if such recovery is based upon the eligible individual's lawful claim, demand or right against a third party or parties (including an insurance carrier).

(emphasis added).

The inclusion of the italicized clauses in the subrogation agreement seems to provide for an unfettered right to reimbursement and recovery, and is markedly different in scope

---

**5.** This language essentially mirrors the subrogation language found in the Rules and Regulations.

than the language in the SPD; the former being more expansive and broader than the latter. The phrase "to reimburse the Plan *in full* from the proceeds of *any recovery received*" bespeaks of the Trustees' power to unconditionally recover all the money it expended resulting from any recovery that is secured by Defendant Bruner.

Clearly, Defendant Bruner had this discrepancy in mind when she insisted on amending the subrogation agreement. The proposed addition to the subrogation agreement, entitled "ADDENDUM TO RWDSU BENEFIT FUND SUBROGATION AGREEMENT," illuminates this point:

> It is expressly understood and agreed that this Subrogation Agreement does not in any way expand the subrogation rights of Retail, Wholesale and Department Store International Union and Industry Benefit Fund.

The language in the second proposed submission is as follows:

> It is expressly understood and agreed that this Amended Subrogation Agreement does not, in any way, expand the subrogation rights of Retail, Wholesale and Department Store International Union and Industry Benefit Fund beyond the rights as specifically set forth in the RWDSU Health and Benefit Fund Summary Plan Description.
>
> This Amended Subrogation Agreement and Amended Addendum replaces and supersedes the *Subrogation Agreement and Addendum* dated February 7, 1994. The February 7, 1994, Subrogation Agreement and Addendum is specifically canceled and invalidated by execution of this new Amended Subrogation Agreement and Amended Addendum.

It is this type of discrepancy, in other words, between the SPD and any documents such as the subrogation agreement, that courts have focused on when concluding that any inconsistencies be adjudged in favor of the SPD. See e.g., *McKnight v. Southern Life and Health Insurance Co.*, 758 F.2d 1566, 1570 (11th Cir.1985) ("Unfairness will flow to the employee for reasonably relying on the summary booklet."). Construing the plan and the ambiguities contained therein, against the drafter, and in favor of the insured, the Court finds the language in the subrogation agreement, without modification, is broader in scope than the language in the SPD. The next issue involves the reasonableness of the Fund's position on securing a signed subrogation agreement before it disburses any benefits. Phrased differently, is the execution of a subrogation agreement, where the parties do not dispute the Fund has subrogation rights, a condition precedent to the payment of benefits?

Significantly, the subrogation language in the SPD does not explicitly address whether the signing of a form is a condition precedent to the payment of medical benefits. The Court finds the sentence "but you *may* be asked to execute documents or to take such other action as is necessary ..." (emphasis added), contrary to Plaintiffs' assertions, does not necessarily compel the conclusion that the signing of a subrogation agreement is an absolute prerequisite to recovery of medical benefits. Plaintiffs have failed to point to anywhere in the SPD or the Rules which would bolster their argument regarding the existence of a condition precedent.

██ There is no doubt the Fund has subrogation rights under the Plan, and the payment of the medical benefits, without securing the subrogation agreement, will not in any way be a financial detriment to the Fund. In fact, it can be argued, as Defendants do, the Fund must first pay the participant before subrogation rights actually attach. Generally, a right to subrogation arises only after the insured's claim has been paid. 16 *Couch on Insurance 2d* § 61:49 at 133 (Rev. ed. 1983).

### 3. Unanticipated Costs

A court must also be mindful of the "concerns with the way unexpected costs may affect the future financial health of the plan." *Blank*, 926 F.2d at 1093. Plaintiffs maintain they have a "clear interest" in implementing and maintaining their policy of securing a signed subrogation agreement before the payment of benefits. To have it any other way, the Fund asserts, would entail claimants, whose benefits have been paid without

the agreement, having little incentive to subsequently sign the agreement, and thus forcing the Fund to expend money on litigation costs to enforce its rights. The Court appreciates Plaintiffs' considerations. However, the relative significance and weight of these considerations are attenuated by the conclusions and findings set forth above.

## IV. Conclusions

The Court is unwilling to grant Plaintiffs' request for a declaration pronouncing that "the Fund shall not be required to process Bruner's claim for benefits unless and until the subrogation agreement provided by the fund to Bruner is executed without modification." Similarly, the Court will deny Plaintiffs' request to enter an injunction compelling Defendant Bruner to execute the subrogation agreement without modification. With respect to Defendants' requests for declaratory relief, the Court finds they should be granted.

Turning to the declaratory relief sought, the Court, cognizant of the fact that ERISA was enacted to "promote the interests of employees and beneficiaries in employee benefit plans," *Bruch,* at 113, 109 S.Ct. at 955, finds the Trustees' interpretation of the Fund's subrogation rights was arbitrary and capricious. More specifically, the Court finds the Fund abused its discretion, and was unreasonable, in withholding payment of the benefits. Moreover, the Court finds the Fund abused its discretion by conditioning the payments of said benefits on the signing of the subrogation agreement, which this Court interprets as being overbroad in scope and incompatible with the language contained in the SPD. The Court finds the subrogation agreement, as phrased in its unaltered form expands the Fund's ability to recover, beyond what is described in the Plan. The issue as to how much is exactly owed to whom, and the determination of damages, will be determined at trial.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1. That Defendant Genesis Hospital's Motion For Summary Judgment filed August 15, 1995 (Docket # 21), seeking declaratory relief, is hereby **GRANTED;**

2. That Defendant Nancy Bruner's Motion For Summary Judgment filed August 24, 1995 (Docket # 28), seeking declaratory relief, is hereby **GRANTED;**

3. That Plaintiffs' Motion For Summary Judgment filed September 1, 1995 (Docket # 31) is hereby **DENIED;**

4. That Genesis's Motion for Summary Judgment On Damages (And Against Cobbie Bruner, Sr. And Nancy Bruner) filed August 21, 1995 (Docket # 27) is hereby **DENIED;** as such, the parties are instructed to be prepared to proceed to trial on the issues of damages on Monday, November 20, 1995;

5. That ruling on the motions for attorneys' fees and expenses is hereby **DEFERRED** until a later time, and will be ruled on by separate Order. The parties are placed on notice that this issue may, at a later time, require the submission of briefs supporting the parties' respective positions; and

6. That Plaintiffs' Motion To Permit The Possible Use Of Evidence Obtained After The Entry Of The Pretrial Statement filed November 8, 1995 (Docket # 63) is hereby **DENIED.**

**DONE AND ORDERED.**