**Samuel W. DEAS, Plaintiff,**

v.

**NATION SHEET METAL WORKERS UNION NATIONAL PENSION FUND, and Sheet Metal Workers Local Union # 441, Defendants.**

**No. 99–0287–P–S.**

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 29, 2000.

Timothy M. Grogan, Mobile, AL, Ray M. Thompson, Hawkins & Thompson, LLC, Mobile, AL, for Plaintiff.

Roderick P. Stout, Union National Pension Fund, Mobile, AL, W. Perry Hall, Pierce, Ledyard, Latta & Wasden, P.C., Mobile, AL, Marc H. Rifkind, Jennifer C. Holmes, Slevin & Hart, P.C., Washington, DC, for Defendants.

**1.** *See* doc. 1, p. 1, footnotes 1–2, corrected designation of named defendants.

**2.** Prior to the taking of testimony, the defendants' Motions to Dismiss (docs.45, 46, 47) the Amended Complaint (doc. 39), plaintiff's

## OPINION AND ORDER

PITTMAN, Senior District Judge.

Plaintiff Samuel Warren Deas brought this action under 29 U.S.C. § 1132(a)(1), the Employee Retirement Income Security Act of 1974 ("ERISA"), against defendants Sheet Metal Workers National Pension Fund ("the Fund") and Sheet Metal Workers' International Association Local Union # 441 ("the Union").[1] ERISA provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" § 1132(a)(1)(B). Plaintiff seeks to recover benefits allegedly due him under the terms of his pension plan, and to enforce his rights under the terms of the pension plan.

Before this court are the claims by the plaintiff of Count One—a breach of contract against the Union and Fund in that his retirement pension and disability benefits were erroneously calculated; in Count Two a claim of negligence, and in Count Three a wanton claim in each count against the Union and the Fund for failure to communicate to the plaintiff changes, modifications, amendments, and break in service of the Pension and Disability Plan, and consequences thereof; and the plaintiff's Amended Complaint, Count One—for additional benefits due him under the Fund's Pension Plan under ERISA; and Count Three—for attorney's fees under ERISA, § 1132(g) (doc. 39).[2]

This matter came to be heard by the court sitting without a jury on April 25–26, 2000. The parties appeared and announced ready for trial. Plaintiff is represented by Ray Morgan Thompson, Esq., and Timothy M. Grogan, Esq; the Union

claims in Count Two *re* claim of breach of fiduciary duty against the Fund, and Count Four *re* a violation of 29 U.S.C. § 401, *et seq.*, the Labor Management Reporting and Disclosure Act, were granted.

and the Fund are represented by Roderick P. Stout, Esq., and Jennifer C. Holmes, Esq. Opening statements were made, evidence was presented, and closing arguments were heard.

Plaintiff filed this action on February 23, 1999, in the Circuit Court of Mobile County, Alabama. On March 19, 1999, the Fund removed the action to this federal district court under 28 U.S.C. §§ 1441(b) and 1446 (doc. 1). This court has original concurrent jurisdiction over this matter pursuant to 29 U.S.C. § 1132(e)(1).

After due and proper consideration of the pleadings and the evidence presented at trial, under the applicable standard of review, this court makes the following findings of fact and conclusions of law.

### I. Findings of Fact

By resolution dated May 16, 1966, the Trustees of the Fund, "persons who are acting as Employer and Union Trustees under the Trust Agreement," adopted a Pension Plan which is a multi-employer employee pension benefit plan as defined under 29 U.S.C. §§ 1002(2)(A); (35); and (37) (see Plaintiff's Ex. 18—1994 Amended & Restated Edition Sheet Metal Workers National Pension Fund Construction Employees Plan A ("Plan 1994"), p. 2; Plaintiff's Ex. 19—Deposition of Marc LeBlanc, Administrator,[3] p. 52).[4]

The purpose of the Fund is to provide pension and ancillary benefits to retired employees who are covered under collective bargaining agreements requiring contributions to the Fund by their employers (doc. 36, p. 6).[5] Under ERISA, the Trust-

ees of the Fund have a duty "[t]o administer the [P]lan in the best interest of the participants and beneficiaries." (Plaintiff's Ex. 19, p. 32).

The Union joined the Fund in 1969 (Tr. 176, 220), The Union is the local collective bargaining labor organization comprised of union shop sheet metal workers, having its principal place of business in Mobile, Alabama (doc. 36, Uncontested Facts, p. 8, ¶ 8). The Union is an "Employee Organization" within the meaning of § 1002(4).

The Union is managed by a business manager, a position which constitutes full-time employment and whose salary is paid by the Union (Tr. 70–71). The Business Manager maintains an office at the Mobile location (Tr. 72; see Plaintiff's Ex. 1). During the time in question, and until 1979, Mr. Connie Rettig was the Business Manager of the Union. Mr. Eurie E. Williams was the Business Manager from 1979 until 1990, and Mr. Billy Fisher was the Business Manager from 1990 until 1998 (Tr. 59–61; doc. 20). Mr. Thomas E. Fisher is the present Business Manager (Tr. 48). The Union represents employees in southern Alabama and western Florida in the sheet metal industry (doc. 9, p. 1, ¶ 3).

The Union is a separate entity from the Pension Fund. The Union has never had authority or control over the Fund assets, over the management of the Fund assets, or over the administration of the Fund. The Union has never had authority or control over the grant or denial of Union

---

3. Mr. LeBlanc has been the Administrator of the Fund since May 1, 1995 (Plaintiff's Ex. 19, p. 6). He attained a Juris Doctor degree in 1982, and commenced his employment with the Fund in 1983. (Id. at p. 7–8). For twelve years Mr. LeBlanc served as house counsel to the Plan, as well as performing legal services for other plans. Id. at p. 67. Mr. LeBlanc is a member of the International Foundation of Employee Benefit Plans. Id. at p. 7–8.

4. The Declaration of Trust establishing the Fund is referred to as the "Trust Agreement." Plan 1994, Section 1.01. The Fund created by the Trust Agreement forms part of the

overall "Plan." Supra., Section 1.02. The "Plan" refers to "the provisions of the Rules and Regulations for the Sheet Metal Workers' National Pension Fund ... duly adopted by the Trustees" Supra., Section 1.04.

5. The situs of the Fund was Washington D.C. (Plaintiff's Ex. 17—Sheet Metal Workers' National Pension Fund Amended and Related Agreement & Declaration of Trust, dated September 22, 1993 ("Plan 1993"), p. 45). Effective October 1, 1996, the situs was deemed to be the Commonwealth of Virginia. Supra., at 58.

members' applications to the Fund for pension or disability benefits. *Id.* at p. 2, ¶ 7.

The Plan applicable to the time relevant herein encompasses "Plan A Sheet Metal Workers National Pension Fund, 1990 Edition" ("Plan 1990") (Plaintiff's Ex. 4; Tr. 138), which was amended, Plan 1993 (Plaintiff's Ex. 17), which was further amended as reflected in Plan 1994, with an effective date of January 1, 1994 (Plaintiff's Ex. 18; Tr. 94).

Marsha Gochnauer has worked for the Fund for twenty-three years. Her current title is Pension Consultant, a position acquired on May 1, 1996 (Tr. 135–36).[6] As Pension Consultant, she acts as an assistant to the Administrator and reports directly to Mr. LeBlanc (Tr. 136, 185).[7]

Ms. Gochnauer explained that there are approximately 200 to 210 local unions participating in the Fund, with approximately 270 unions across the United States; presently, there are approximately 70,000 active participants (Tr. 189, 191). Approximately 120 to 150 retirement and disability applications, and informational claims are processed each month by the Fund (Tr. 187). The Administrative Office of the Fund has a duty "[t]o accurately and completely process applications for information, and pensions. To determine the amount of those benefits and to pay them on a monthly basis[,]" and to administer the Plan in the best interest of the members (Tr. 192). The money contributed to the Fund by the employers becomes the property of the Fund and is to be distributed to eligible members for benefits earned (Tr. 193). A "Contributing Employee" is "any employer ... who ... has a Collective Bargaining Agreement with the Union requiring periodic contributions

to the Fund ..." Plan 1994, Section 1.08(a).[8]

When a sheet metal worker works for a contractor through the Union, the employer submits monthly reports indicating the number of hours worked and the contribution made on behalf of that worker (Tr. 164). The Fund tracks the number of hours accumulated by each worker and the contributions made on behalf of each worker and has done so since 1969, when the Union joined the Fund (Tr. 164, 220). A record of plaintiff's hours and contributions has been so maintained (Tr. 164; *see* Defendants' Ex. 32).

Communications between the Plan and the local unions are "routinely" maintained (Plaintiff's Ex. 19, p. 16). Routine communications include, for example, a union sending its collective bargaining agreement to the Fund, a union inquiry on behalf of a participant regarding retirement or disability benefits, and the responses to such communications by the Fund. (*Id.* at p. 16–17).

Plan amendments are disseminated to the membership. A summary of material modifications is sent generally in letter form when modifications occur (Tr. 180), and articles are published in various industry publications. Plan modifications are sent by mail directly to the participants and to the unions in booklet form and through union publications (Plaintiff's Ex. 19, p. 24–26). Further, a "Summary Plan Description," a non-technical summary or statement of the rules and regulations of the Plan (Tr. 178), is restated every five or six years and is distributed to all participants (Tr. 178). Annually, a "pension credit statement" is sent directly to each

---

**6.** Prior to May 1996, she worked exclusively for the Fund in the determination of pension benefits and was involved in the determination of plaintiff's pension benefits, as set forth herein (Tr. 135–36).

**7.** Neither Ms. Gochnauer, nor Mr. LeBlanc have been named as defendants.

**8.** The term "Collective Bargaining Agreement," means "any labor contract between an Employer and the Union which provides for contributions to this Fund together with any renewal, modification, or amendment thereof or successor agreement thereto, as approved by the Trustees as a basis for participation in the Fund ..." *Supra.,* Section 1.09.

member by the Fund (Plaintiff's Ex. 19, p. 27).

Plaintiff and his wife, Bonita G. Deas are residents of Salitpa, in Clarke County, Alabama. Plaintiff has an eighth-grade education. At seventeen, he began doing sheet metal work and joined the sheet metal apprentice program in 1957. Plaintiff went to the sheet metal apprentice school for five years. He attained journeyman status. Plaintiff has been a dues paying member of the Union since 1957, when he became an apprentice (Tr. 32–36). There is no dispute that plaintiff is a "Participant" under the Plan.[9]

As a sheet metal worker, plaintiff was employed, through Union referrals, by a number of contributing employers. Plaintiff explained that his sheet metal work, for the most part, involved the installation of air ducts and industrial fans, and "boiler lagging" ("put[ting] metal on the side of boilers") (Tr. 39). The work is conducted inside and outside, off the ground (as much as ten stories high), and requires climbing scaffolding and ladders (Tr. 38–39).

As a member of the Union and a participant of the Plan, plaintiff was sent periodic reports of the hours reported by employer-contractors, as well as annual pension credit statements. Reporting for plaintiff dates back to 1969 (Tr. 165).

In "the latter part of 1973," because work in the sheet metal industry was becoming less than plentiful and plaintiff was not working, plaintiff spoke with Mr. Rettig (Tr. 84), about moving his family to Choctaw County, Alabama, to open a package store, and bait and tackle shop. Mr. Rettig suggested that plaintiff continue to pay his union dues and to maintain his membership-in-good-standing. *Id.* The Union Secretary who was present during the conversation (Tr. 72–73), suggested that plaintiff "withdraw" (Tr. 85). Plaintiff did not want to do so, even though he understood that such status would preclude him paying dues, because "[he] wanted to be eligible to go to work. Any time work becomes available ... I wanted to stay in good standing with the local union" (Tr. 85–86). At trial, plaintiff testified that there was no discussion regarding pension or disability benefits, nor a "break in service" (Tr. 75, 86). Previously, by affidavit, plaintiff had stated to the contrary (doc. 15—Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment, Plaintiff's Affidavit, p. 2)

In December, 1974, plaintiff moved to Choctaw County, Alabama (Tr. 69), and operated the referred to shop in Bladon Springs, Alabama (Tr. 70–71). Plaintiff did not work in the sheet metal industry from November 1974, through October 1978 (Tr. 37).

In November, 1978, plaintiff returned to work in the sheet metal industry and resumed the accumulation of hours through April 1993 (Defendants' Ex. 32). At an unspecified point during this time period, plaintiff began to experience knee problems. "I was not able to continue climbing like I had been previously doing." (Tr. 40). Plaintiff described his knee pain to be "[similar] to having a toothache," (Tr. 43); he experienced swelling of his knees and had difficulty walking, having fallen "a couple of times" (Tr. 44).

On November 11, 1993, plaintiff was evaluated by Dr. William Isaiah Park, III, an orthopaedic surgeon. Dr. Park has been Board Certified since 1974, and an orthopaedic surgeon in Mobile, Alabama, since August 1975 (Tr. 95–96; *see* Plaintiff's Ex. 2).[10] Dr. Park diagnosed "old Osgood Schlatter's disease involving the

---

9. "Participant" means "a Pensioner, a Beneficiary, or an Employee who meets the requirements for participation in the Plan as set forth in Article 3 [ (PARTICIPATION OF EMPLOYEES) ], or a former Employee who has attained Vested Status under Section 9.07 of the Plan." Plan 1994, Section 1.17, p. 6.

10. The Union objected to Dr. Park's testimony at trial. The objection was noted. Following a careful review, the court finds that Dr. Park's testimony is not considered to resolve the issues herein. The documentary evidence, including Dr. Park's letters, reports, and office, speaks for itself.

tibial tubercle of both knees as well as patello-femoral and early medial compartment osteoarthritis" (Plaintiff's Ex. 2).

In a letter dated December 2, 1993, addressed "To Whom It May Concern," Dr. Park noted that "[t]his is an occupational hazard in people who do his type of work" and that ideally, to mitigate "rapid progression," plaintiff "should avoid repeated squats, deep knee bends, ladder climbing and working up on scaffolds. He will probably eventually come to a total knee replacements." *Id.*

On December 27, 1993, plaintiff applied for disability insurance benefits through the Social Security Administration (*see* Plaintiff's Ex. 13).

On December 28, 1993, plaintiff applied for a disability pension through the Fund based on "knee & leg problems" with an onset date of December 1, 1993 (Plaintiff's Ex. 1). Plaintiff did not request any type of job modification (Tr. 81–82).

Plaintiff completed the application at the Union office (Tr. 48). Plaintiff testified that Mr. Fisher sent the completed application form to the Fund, and he was told that he should get full benefits in the amount of $1,070.00 per month (Tr. 50).

Disability pension benefits are available only to participants who become permanently and totally disabled, meaning that they are unable to perform sheet metal work or any other work in the construction industry. Plan 1990, Section 5.10(a). To be eligible, an employee must have been credited with a certain amount of service and be permanently and totally disabled. *Supra.*, Sections 5.04(a) and 5.11.

"Total and Permanent disability" defined:

A participant shall be deemed permanently and totally disabled within the meaning of this Plan only if the Trustees, in their sole and absolute discretion, shall determine on the basis of medical evidence that:

(a) such Participant is totally unable, as a result of bodily injury or disease to engage in or perform the duties of a Sheet Metal Worker or other employment in the construction industry for remuneration or profit and is unable to earn more than the amount utilized under the Social Security Act to determine eligibility for full benefits for retired individuals age 65, subject to the limitations of Section 8.06(a), and

(b) such disability will be permanent and continuous for the remainder of his life.

*Supra.*, Section 5.11 (Tr. 138–39).

Upon receipt by the Fund of an application for benefits, the application proceeds to a processing clerk. A receipt letter is mailed to the applicant. The claim is then reviewed and a determination is made by a pension analyst regarding the work history and supporting documentation to determine whether, under the rules and regulations, the individual is qualified and eligible for benefits and, if so, the amount of the benefit (Tr. 143). Mr. LeBlanc does not necessarily review a determination before it is communicated to the member (Plaintiff's Ex. 19, p. 33–34). Mr. LeBlanc will review a claim determination if a staff member asks him to do so. (*Id.* at p. 36).

Plaintiff's disability application was received by the Fund in January 1994 (Tr. 140). By letter dated January 26, 1994, plaintiff was notified that his application for disability benefits had been received (Plaintiff's Ex. 5). Mr. Fisher received notice of plaintiff's application and provided proof to the Fund of plaintiff's membership in the Union from January 1, 1957 (Tr. 52–53; *see* Plaintiff's Ex. 6).

On February 8, 1994, Dr. Park wrote to the Fund (Tr. 128; Plaintiff's Ex. 3).

I have completed the forms concerning [plaintiff's] possible disability ... [H]e has an occupational hazard in doing jobs that require climbing, squats and deep knee bends. In the standard tables there is no permanent partial disability for this. Job modification is more important than anything else ... The only

way we can document what kind of functional limitations he has is for him to have a functional capacities form completed at HealthSouth for a nominal charge. I recommend that you or the patient follow through with that evaluation.

*Id.* A copy of Dr. Park's office notes and a copy of the Report of Medical Evaluation completed by Dr. Park are attached to the letter. *Id.* The Evaluation indicates that "the clinical condition is not likely to improve with further active medical treatment or surgical intervention—medical maintenance care only is warranted" and "employability is not likely to improve with further medical treatment or surgical intervention" *Id.* at p. 4. "He is permitted to work in present capacity but needs job modification." *Id.* at p. 5.

On March 18, 1994, on behalf of the Fund, Dr. Levy reviewed the medical evidence submitted by plaintiff with his application for disability benefits (Defendants' Ex. 14). At the time, plaintiff's benefits application file included copies of Dr. Park's December 2, 1993 "To Whom It May Concern" letter, Dr. Park's completed Report of Medical Evaluation dated February 7, 1994, the Medical Release form completed by plaintiff, and Dr. Park's February 8, 1994 letter with office notes attached (Plaintiff's Ex. 2–3; Tr. 199).

Dr. Levy is retained by the Fund to review claims for disability and to make recommendations and determinations regarding disability (Tr. 146). Dr. Levy is not an employee of the Fund, but is paid a remuneration for his work (Plaintiff's Ex. 19, p. 42–43). The Fund routinely submits all disability medical claims to Dr. Levy for review (Tr. 146, 198). Dr. Levy is located in Washington, D.C. (Tr. 146).

Dr. Levy determined that plaintiff's application be "[d]enied, as not disabled by our standards." *Id.*

> [Plaintiff] is claiming for disability on the grounds of what his orthopaedic surgeon, Dr. W. Park, describes as "moderate osteoarthritic changes consistent with his age and work." In a certificate dated Dec. 2, 1993 Dr. Park makes it even more clear that he does not regard [plaintiff] as being disabled.

> Since the extent of [plaintiff's] stated disability is well below our stated criteria we recommend that his application be denied.

(Defendants' Ex. 14). Although Dr. Park had suggested that plaintiff have a functional capacity evaluation at HealthSouth, Dr. Levy did not recommend such an evaluation (Tr. 198).

Ms. Gochnauer did not contact plaintiff regarding Dr. Park's suggestion (Tr. 197). When asked if the Fund assists members in processing their claims, Ms. Gochnauer stated: "If we need additional information from a member we will ask him for it ..." (Tr. 193), "[w]e send them requests for the information ... we ask them routinely for the names of their doctors so that we can obtain the information for them" (Tr. 201). The Fund would not have requested further medical evidence from plaintiff unless ordered to do so by Dr. Levy (Tr. 200, 202).

The Fund denied plaintiff's application on June 2, 1994 (Tr. 53–54). Written notice of the denial indicated that plaintiff had provided insufficient proof of disability (Plaintiff's Ex. 7). Dr. Park, had not found plaintiff totally and permanently unable to perform any employment in the construction industry. The denial relied on Dr. Park's letter of February 8, 1994, reflecting that plaintiff suffered with a permanent partial disability, not a total disability; Dr. Park had noted that plaintiff "is permitted to work in present capacity but needs job modifications." *Id.* The letter references Section 5.11 of the Plan. "Based on a review of your medical records, we find that you are not permanently and totally disabled as determined by the Trustees in their sole and absolute discretion." *Id.* The Fund advised plaintiff that should he be approved for Social Security Disability benefits, he may wish to resubmit his application with proof of ap-

proval and a request for re-evaluation by the Fund. *Id.*

The June 2, 1994 letter also notified plaintiff that the Fund's records indicated a break in service, he had not been working in "Covered Employment" from November 1974, through October 1978. *Id.* "Covered Employment" means

... work performed on behalf of one or more Contributing Employers in a job classification and at a place of business covered under a Collective Bargaining agreement ... also ... work performed by an Employee on behalf of one or more Contributing Employers in his capacity as a Covered Employee ...

Plan 1994, Section 1.11.

The June 2, 1994 letter refers to Plan 1990, Section 4.11(d). As amended, the applicable Section 4.12 which defines "Breaks in Service," and provides:

(a) Purpose

The purpose of this Section is to define the terms "One–Year Break in Service" and "Permanent Break in Service." This Section also describes the effect of a Break in Service on previously credited service for vesting, participation and benefit accrual purposes.

(b) One–Year Break in Service Defined .

(1) An Employee incurs a One–Year Break in Service if he fails to complete 435 Hours of Work in Covered Employment during any Calendar Year after 1975.

.  .  .  .  .

(c) Effect of a One–Year Break in Service

.  .  .  .  .

(2) Vesting

In the case of any Employee who has incurred a One–Year Break in Service, the Years of Service credited to such Employee prior to his Break

in Service shall be disregarded for purposes of Section 9.07 [Vesting] ...

(3) Pension Credit

In the case of any Employee who has incurred a One–Year Break in Service, the Pension Credit earned by such Employee under Article 4 prior to his Break in Service shall be disregarded ...

(d) Permanent Break in Service Defined

. . .

.  .  .  .  .

(2) Permanent Break in Service after 1975 or after the Contribution Date [11] if later, and before 1985

An employee who has less than four ... Years of Service shall be deemed to incur a Permanent Break in Service if he has at least three ... consecutive One–Year Breaks in Service after his Contribution Date, including at least one after 1975. A person who has four ... or more Years of Vesting Service shall incur a Permanent Break in Service when the number of his consecutive One–Year Breaks in Service equals or exceeds the Employee's total number of Years of Service before such Breaks in Service ...

(e) Exceptions

.  .  .  .  .

(4) Involuntary unemployment during one of the Calendar Years 1973, 1974, or 1975. Not more than one of these Calendar Years may be used in determining whether or not a Break in Service has occurred, and the Trustees shall be the sole and final judges of what constitutes involuntary unemployment for an Employee who has remained available for Covered Employment, on the basis of information received from the Employee, the Business Manager of the Local Union or any other source required for verification ...

---

11. The "Contribution Date" is "the first date for which a Contributing Employer was or shall be obligated by a Collective Bargaining Agreement or other applicable agreement to make contributions to the Pension fund. The Contribution Date to be applied to each Employee shall be the date for which a Contributing Employer first became obligated to make contributions to the Pension Fund on his behalf." Plan 1994, Section 1.14.

(f) Effect of a Permanent Break in Service

. . . . .

(2) Vesting

In the case of an Employee who has incurred a Permanent Break in Service, the Years of Service credited to such Employee prior to such Permanent Break in Service shall be permanently disregarded for purposes of Section 9.07 [Vesting].

(3) Pension Credit

In the case of an Employee who has incurred a Permanent Break in Service, the Pension Credit earned by him under Article 4 prior to such Permanent Break in Service shall be permanently disregarded.

*Supra.*, Section 4.12, p. 28–32 (footnote added).

With regard to Section 4.12, Ms. Gochnauer explained

. . . if an individual has . . . a permanent break in service, he has interrupted his covered employment in the plan at a time when he had not attained vested status, and if he separates or leaves coverage in the plan for a significant period . . ., he loses the pension credit he had earned before the permanent break in service . . . A year of vesting credit is earned in a calendar year when the participant performs 870 hours of work for which contributions are due . . . If a participant earns less than 435 hours in a calendar year, he has a one-year break in service . . .

(Tr. 161–62).

Plaintiff's Pension Inquiry Report reflects plaintiff's credited history.

| Year | Hours Credited | |
|------|------|------|
| 1965–69 | 1200 (24 months) | vesting yr. |
| 1970 | 1200 | vesting yr. |
| 1971 | 1897.50 | vesting yr. |
| 1972 | 921.50 | vesting yr. |
| 1973 | 404.50 | (below the requisite 435 hours needed) |
| 1974 | 779.50 | (prior to November, 1974) |
| 1975 | 0 | |
| 1976 | 0 | |
| 1977 | 0 | |
| 1978 | 248. | (below the requisite 435 hours needed) |
| 1979 | 583. | |

(Tr. 166–69; Defendants' Ex. 32). From 1975 through 1978, plaintiff incurred four consecutive years earning less that 435 hours which equals the number of vesting years he had previously accumulated, four—1965–99 through 1972, constituting a permanent break in service (Tr. 173).

From 1979, plaintiff resumed his accumulation of credit hours through April 1993 (Defendants' Ex. 32). Plan 1994 contained a ten year vesting requirement (Tr. 173–74); plaintiff earned sufficient credits to vest.[12] Plaintiff also earned pension

credits sufficient for benefits in the amount of $451.00 per month for life, i.e., ten years and ten months of credited service after the break in service (Tr. 174).

As noted, Plan 1994 contains a waiver provision if a permanent break results from poor employment opportunities, Section 4.12(e)(4). Ms. Gochnauer explained:

. . . [I]f a person incurred a permanent break because of high unemployment in his local area and he was unable to perform any other work, only one of the

---

**12.** Ms. Gochnauer testified that on January 1, 1997, Plan 1994 was amended as to the ten year vesting requirement. As amended, the Plan provides that an individual with five years vesting service has an irrevocable right

to a benefit. The amendment is not retroactive and applies only to those who were active participants as of January 1, 1997 (Tr. 174–75). Plaintiff was not an active participant at that time (Tr. 175).

three calendar years, 1973, 1974, or 1975 would be used in determining whether a permanent break was incurred.

(Tr. 214). In plaintiff's case the break in service occurred "in '75, '76, '77 and '78 ... [i]n applying the waiver rule, [the Fund] utilized only one of the years in '73, '74 and '75" (Tr. 215). In plaintiff's case, 1975 was the excepted year. The waiver provision did not alter plaintiff's status because plaintiff's break in service was between 1975–78, and came at the end of the waiver period (Tr. 215–16).

There is also a provision in the Plan for granting "past service credits" for work in the industry by an individual prior to 1969, when the Union joined the Fund (Tr. 226). "A union membership can on a presumption of work grant past service credit for employment in the sheet metal industry before the employers became obligated to contribute to the plan" (Tr. 176). Section 5.08, Eligibility for a Vested Pension provides:

> A Participant shall be eligible to retire on a Vested Pension, if he meets either of the following requirements:
>
> (1) he has at least 10 years of Pension Credit, five of which are Future Service Credit [13]; or
>
> (2) he has at least 10 years of Vesting Service.

Plan 1990 (footnote added) (Tr. 227).

> Future Service Credit is granted for periods of work in Covered Employment after your Contribution Date. These hours you worked for which an employer was obligated to make contributions to this fund. You earn one year of Future Service Credit in each calendar year in which you work 1200 hours or more in Covered Employment ... It is important to remember that to be eligible for retirement benefits an employee must

have at least 12 months of future Service Credit ...

*Supra.*, at p. 14.

Plaintiff was credited with twelve years of past service credit (Tr. 228). Plaintiff was short of the requisite future service credit. Plan 1994, Section 4.02. "[E]very 100 hours [of service] equals one month of future service credit. [Plaintiff] had ... 56 months of future service credit ... He would have needed to have 60 months to have five years of future service credit ... Four months shy of being vested" (Tr. 229–30).

> The Fund's June 2, 1994 letter noted:
>
> ... You incurred a break in service as of 12/31/78. This break in service resulted in the loss of all service prior to the break. As a result, your credited service began when you returned to Covered Employment as of 11/78.
>
> .    .    .    .    .
>
> ... [Y]ou are vested and have been credited with 10 years and 10 months of Future service, from 11/78 through 11/93, ...
>
> .    .    .    .    .
>
> With this service and rate, you would be entitled to benefits at age 65 of about $451.00 per month ...
>
> If you have any questions, please feel free to call on our toll free number ...
>
> If you wish the Trustees to review your case, you must write this office within 180 days of receipt of this letter and request that your case be appealed at the next scheduled Trustees' meeting. You must state the reasons for your appeal in the letter. A summary of your rights under ERISA is given on pages 24–25 of [Plan 1990].

(Plaintiff's Ex. 7, p. 2–3).

Plaintiff testified that this notice was the first indication he had of a break in service; he had never received any information regarding retirement until he applied

---

**13.** "Future Credit Service" is defined as "periods of Covered Employment subsequent to the Contribution Date for which Pension Credit is granted ..." Plan 1994, Section 1.16.

for disability benefits in 1993 (Tr. 50, 54). Plaintiff admitted receiving his annual credit statements which reflected his yearly credited hours history (Tr. 75).

The Fund does not compile a list of individual members with breaks in service. Members get Pension Credit statements which track their hours; they do not receive warnings pertaining to breaks in service. The Fund "sends them the summary plan descriptions which define the terms and how they incur a break, . . ." (Tr. 223–24).[14]

Once an applicant is denied a disability pension, he may appeal to the Trustees (Tr. 144). The Trustees

> have the sole and absolute power, authority and discretion to determine: . . . the standard of proof required in any case[,] . . . the application and interpretation of [the] Plan[,] . . . entitlement to or amount of pension[,] . . . the disability, extent of disability, or non-disability of Plan participants . . . The decisions of the Trustees with respect to any of the foregoing shall be final and binding. Whenever in the Plan the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform and non-discriminatory manner.

Plan 1994, Section 9.03, p. 62–63.

If the participant's appeal is denied by the Trustees, that decision is final and binding (Tr. 178–79). Section 9.04, Right of Appeal, provides:

> A Participant whose application for benefits under this Plan has been denied, in whole or in part, is to be provided with adequate notice in writing setting forth the specific reasons for such denial, and shall have the right to appeal the decision, by written request filed with the Trustees within 180 days after receipt of such notice. The appeal shall be considered by the Trustees or by a person or committee designated by the Trustees. The decision shall be final and shall be communicated to the claimant.

(Tr. 144; *supra.*, at p. 63). There is no mechanism under the Plan for reopening a benefits application once it is denied; the application is considered no longer pending (Plaintiff's Ex. 19, p. 58–59). Plaintiff was advised of his right to appeal, of the procedures necessary, and of the time within which to do so (Plaintiff's Ex. 7, p. 3).

On June 29, 1994, plaintiff appealed both the disability denial and the Fund's determination that he had a Permanent Break in Service (Plaintiff's Ex. 8). Plaintiff was represented by counsel, his brother, Thomas Allen Deas, Esq. (Tr. 55). The appeal letter noted:

> . . . [plaintiff] should not be penalized for an alleged break in service for the following reasons. During a four year period in the seventies, Connie Rettig told [plaintiff] that he should seek other employment because (sheetmetal) work was so slack at that time. Mr. Rettig told him that these years of service would still count (upon retirement age) as long as he paid his union dues. [Plaintiff] relied upon these statements, paid his dues, and should not suffer additional undue hardship upon retirement. Please review the equities and estoppel argument in this appeal and grant just relief by finding that no break in service resulted for the years in question.

(Plaintiff's Ex. 8).

By letter dated July 27, 1994, to plaintiff's counsel, the Fund restated the basis for denying plaintiff the disability pension, "his condition does not constitute a total and permanent disability under the Plan rules[,]" and noted that "Mr. Rettig has never been an employee of the Fund" (Plaintiff's Ex. 9). Counsel was informed that plaintiff's case would be added to the agenda of the next Fund Appeals Committee meeting. The letter is signed by Marsha Gochnauer, Benefit Coordinator. *Id.*

---

**14.** Since 1983, each member receives notice about the break in service rules when he receives the Plan (Plaintiff's Ex. 19, p. 29).

Ms. Gochnauer explained that at the Appeals Committee level, a review of the application file is conducted. The Appeals Committee is made up of two Trustees, one from the employer and one from the Union (Tr. 144–45). Plaintiff's appeal file contained all the documentation accumulated, including Dr. Park's December 2, 1993 letter addressed "To Whom It May Concern" (Plaintiff's Ex. 2); a completed form entitled "Sheet Metal Workers National Pension Fund Report of Medical Evaluation (Permanent Medical Impairment)" dated "2/7/94" (Defendants' Ex. 7) (Tr. 141); Dr. Park's February 8, 1994 letter with Dr. Park's office notes (Plaintiff's Ex. 3) (Tr. 142); and Dr. Levy's report and recommendation (Tr. 146), with plaintiff's record of hours worked (Tr. 147). No other information or documentation was submitted on plaintiff's behalf (Tr. 143, 147).

By letter dated October 3, 1994, the Trustees denied plaintiff's appeal (Plaintiff's Ex. 10). The Committee determined based on the medical evidence presented that plaintiff did not suffer a total and permanent disability. The Committee also found that plaintiff

> had earned 0 pension credit in 1975, 1976 and 1977 and 2 months credit in 1978. As stated in the letter from the Pension Benefit Department, date 6/1/94, Section 4.11d of the Plan rules states that a permanent break in service shall be incurred if a Participant fails to earn 6 months of pension credit in 3 consecutive calendar years. You indicate that Mr. Deas worked elsewhere due to high unemployment during this time. Section 4.11(f4) of the Plan rules provides that if failure to earn sufficient credited service during 1973 – 1975 was due to documented unemployment, only one of those 3 years shall be used in determining if a permanent break was incurred. However, using only one of these years—1975—Mr. Deas still incurs a permanent break in service as of the third year. As you will note from reviewing Article 4, simply continuing to be a dues-paying member does not earn

credited service or constitute a waiver of break in service provisions.

*Id.* Mr. LeBlanc reviewed the material that was submitted to the appeals committee in connection with their determination (Plaintiff's Ex. 19, p. 37).

On October 10, 1994, Mr. Fisher wrote to the Fund at plaintiff's request (Tr. 58), "to appeal," and "appeal[ed]" to the Trustees to restore all of [plaintiff's] credits and let [plaintiff's] records show that he did not incur a break in service during the mid-seventies" (Plaintiff's Ex. 11).

"... [T]here is no mechanism under the Plan for re-opening a benefits application previously denied, the Trustees have always treated re-applications for disability benefits after denial of a benefits appeal as a new application rather than a reopening of the initial application." (doc. 26, Affidavit of Mr. LeBlanc, ¶ 10). Ms. Gochnauer explained that Mr. Fisher's letter to the Fund was considered a "request for information from his local union ..." (Tr. 203–04). It did not constitute an appeal as it provided no further information or evidence in support of plaintiff's claim for benefits. Mr. Fisher's letter was not presented to an appeals committee (Tr. 209).

On November 1, 1994, the Fund responded by letter that the Appeals Committee found no grounds for reversal of the denial of benefits (Plaintiff's Ex. 12).

Effective January 1, 1994, the Plan was amended by the Trustees to accept a Social Security Administration determination of disability as proof of a disability. Plan 1994, Section 5.04, p. 43 (Tr. 231, 252), provides, in pertinent part:

> (a) A Participant shall be entitled to retire on a Disability Pension if he becomes permanently and totally disabled so that he cannot perform any significant employment in any field whatsoever as demonstrated by proof of approval for Social Security Disability after January 1, 1994 and at a time when:
>
> .     .     .     .     .

(6) he has been permanently and totally disabled as demonstrated by proof of approval for Social Security Disability after January 1, 1994 for at least six (6) months.

*Supra.*, at 43–44 (Tr. 153, 155–56).

By a decision dated December 21, 1994, the Social Security Administration determined that plaintiff was disabled and entitled to disability insurance benefits, effective November 15, 1993 (Plaintiff's Ex. 13). Plaintiff was notified of his disability award on January 23, 1995 (Defendants' Ex. 23). Plaintiff was advised that the beginning date was May 1994. *Id.*

Approximately one year later, by letter dated January 29, 1996, Mr. Fisher provided the Fund with notice that the Social Security Administration had determined that plaintiff was disabled (Defendants' Ex. 23). Upon receipt of Mr. Fisher's notice, under the established policy and interpretation of the terms of the Plan 1994, the Fund treated the correspondence as a new application for disability benefits with the Social Security award constituting proof of disability (Tr. 151, 156).

By letter dated April 30, 1996, the Fund notified plaintiff that he had been approved for disability pension benefits effective March 1, 1996. Plaintiff's Ex. 14 (Tr. 156).

On May 13, 1996, plaintiff's counsel Mr. Grogan appealed the Fund's decision regarding the effective date of disability on plaintiff's behalf (Plaintiff's Ex. 15). Plaintiff asserted that his disability pension should be paid retroactive to the onset date of disability as determined by the Social Security Administration, November 15, 1993. *Id.* The letter was treated as an appeal (Tr. 157).

By letter dated July 8, 1996, plaintiff learned that the Appeals Committee denied his appeal (Tr. 157). Plaintiff was advised of the Plan rules:

Section 8.01 ... states that application for pension must be in writing in a form and manner prescribed by the Trustees, and must be filed with the Trustees in advance of the first month for which benefits are payable.[15] The Fund Rules make no provision for retroactive payments in the case of a participant who provides proof of disability after the date the disability was incurred.

The Committee found that [plaintiff] had reapplied for his pension benefit, in writing, as of February 1996, making his earliest effective date of pension March 1, 1996.

(Plaintiff's Ex. 16) (footnote added). As noted, the Plan makes no provision for retroactive payment of benefits (Tr. 159, 232).

Section 9.01 provides:

Application for a pension must be made in writing in a form and manner prescribed by the Trustees and must be filed with the trustees in advance of the first month for which benefits are payable.

Plan 1994, p. 62 (Tr. 233).

Section 9.05(a) reiterates that no benefits may be paid prior to the Fund's receipt of an application compliant with the terms of the Plan. *Supra.*, p. 63.

Plan 1990 clearly sets out under "SOME QUESTIONS AND ANSWERS Applying for Benefits," that benefit payments will not be made for any month prior to the one in which the application is filed. Plan 1990, p. 20.

On April 22, 1997, plaintiff, with the assistance of his counsel, completed and submitted the declarations and signature pages required to begin receiving the Fund's disability pension (Defendants' Ex. 31). Plaintiff is currently being paid disability benefits from the Fund in the amount of $451.00 per month (Tr. 160).

---

**15.** Section 8.01 of Plan 1990, as amended is Section 9.01 of Plan 1994 (*see* Plaintiff's Ex. 4, p. 54; Plaintiff's Ex. 18, p. 62). Substan- tively, the Sections are identical; only the Section designation changed.

## II. Conclusions of Law

### A. Count One: Breach of Contract

■ This is a state law claim of breach of contract. It is preempted by ERISA.

### B. Counts Two and Three of the Complaint: Negligence and Wantonness

■ In Counts Two and Three, the plaintiff apparently seeks to hold the defendant Union and defendant Fund liable for negligence and wantonness in the respective counts on state law claims and under ERISA, on the theory that the defendant Union and/or the Union's local manager, Mr. Rettig, was fiduciary of the Fund.

These state law claims fail for they are preempted by ERISA.

*Fiduciary Claims Under Counts Two and Three*

■ The fiduciary claims fail because neither the Union, nor its local manager, Mr. Rettig, was a fiduciary of the Fund for reasons herein after set out.

Plaintiff claims a breach of fiduciary duty in that the Union failed to inform him of Plan requirements, amendments or modifications which resulted in a detrimental alteration of the pension benefits to which he would have been otherwise entitled.[16] Plaintiff argues that, but for, Mr. Rettig's representation that he need only maintain his Union membership-in-good-standing to preserve his pension benefits, and the Fund's failure to explain a break in service and how a break in service would affect plaintiff personally, he would have worked the hours required even if, he had to travel to other parts of the country to do so.

"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—. . . for the exclusive purpose of: . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan; . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title . . ."

29 U.S.C. § 1104(a); *Hamilton v. Allen–Bradley Co., Inc.*, 217 F.3d 1321, 1327 (11th Cir.2000). "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable . . ." § 1109(a); *see Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.,* —— U.S. ——, 120 S.Ct. 2180, 2187, 147 L.Ed.2d 187 (2000); *Mertens v. Hewitt Associates,* 508 U.S. 248, 252, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Herman v. South Carolina Nat. Bank,* 140 F.3d 1413, 1419 (11th Cir.1998), *cert. denied sub nom. Fickling v. Herman,* 525 U.S. 1140, 119 S.Ct. 1030, 143 L.Ed.2d 40 (1999).

A "fiduciary" is one who "exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . he has any discretionary authority or responsibility in the administration of [the] plan . . ." § 1002(21)(a); *Mertens,* 508 U.S. at 251,

---

**16.** The court notes that plaintiff's claim of breach of fiduciary duty against the Fund, raised in plaintiff's Amended Complaint (Count Two) was dismissed pursuant to the Fund's Motion To Dismiss (doc. 45). *See* footnote number 2, herein. In the Amended Complaint, plaintiff averred that the Fund had breached its fiduciary duty by wrongly refusing to pay benefits; providing incorrect information with regard to preserving maximum pension benefits; wrongly failing to find plaintiff's disability benefits should be calculated from November 15, 1993; and wrongly failing to find plaintiff eligible for full benefits (doc. 39). As noted, these claims were dismissed immediately prior to trial.

113 S.Ct. 2063. ERISA defines the term "fiduciary," "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan ..." *Id.* at 262, 113 S.Ct. 2063 (emphasis in original). A fiduciary is "someone who has any discretionary authority over the administration of the plan ... a plan administrator is performing a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits." *Hamilton*, 217 F.3d at 1328. The proper party defendant in an action pertaining to ERISA benefits is the party that controls the administration of the employee benefit plan, i.e. the fiduciary. *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997); *Gendron v. Franklin Life Ins. Co.*, 980 F.Supp. 1233, 1235–36 (M.D.Fla.1997).

"[A] 'fiduciary must give complete and accurate information in response to participants' questions[,]" and a "failure to disclose information ..., if true, is ... a breach of a fiduciary duty." *Hamilton*, 217 F.3d at 1329 (quoting, *Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir.1992).) Plaintiff claims breach of fiduciary duty in that the Union failed to inform him of Plan requirements, amendments or modifications which resulted in a detrimental alteration of the pension benefits to which he would have been otherwise entitled. In support of his claim, plaintiff asserts that he relied on the oral advice and counsel of Mr. Rettig, the Union Business Manager. According to plaintiff, Mr. Rettig represented to him that from 1973 through 1978, plaintiff need only pay his Union dues to maintain full disability and pension benefits. To plaintiff's detriment, Mr. Rettig's counsel was less than reliable. The court notes that plaintiff did not name Mr. Rettig as a defendant in this action.

Even so, the evidence reflects that neither the Union, nor Mr. Rettig as the Union's Business Manager were fiduciaries of the Fund or administrators of the Plan. Rather, the evidence reflects that the Union was, and is a separate entity from the Fund. The Union has never had authority or control over the Fund assets, over the management of the Fund assets, or over the administration of the Fund via the Plan.

The evidence establishes that pursuant to Section 9.03, the Trustees of the Fund "have the sole and absolute power, authority and discretion" over applications, benefit payments, and retirement. Without evidence to the contrary, plaintiff's claim for breach of fiduciary duty against the Union must fail; plaintiff has presented no such evidence.

■ Plaintiff argues that the Union and Mr. Rettig "were clothed with apparent authority as a fiduciary of the [Fund] and breached their fiduciary duty to plaintiff" by misadvising him regarding the relevance of paying his Union dues consistently (doc. 15, p. 1, ¶ 2). In support of this argument, plaintiff asserts, in part, that Mr. Rettig and the Union "were the plaintiff's only source of information about the [Fund], its policies and procedures and benefits ..." *Id.* p. 4.

The evidence contradicts plaintiff's assertion. The evidence establishes a direct communication link between the Fund and its members. Annually, each member is sent his pension credit statement, reflecting his credited hours. Plaintiff admits receiving his annual credit statements from the Fund (Tr. 75).

The evidence shows that Plan amendments are also disseminated to the membership. Summaries of material Plan modifications are sent directly from the Fund to members in letter and booklet form when modifications occur. Plan modifications are also disseminated through union publications. Further, non-technical summaries of Plan rules and regulations, Summary Plan Descriptions, are restated every five or six years and distributed to all members. Although plaintiff claims that he received nothing from the Fund regarding retirement benefits, it is clear that Mr. Rettig was not plaintiff's only avenue for information.

■ As to plaintiff's argument regarding the apparent authority of Mr. Rettig. Plaintiff relies on Alabama agency law. *Glass v. Southern Wrecker Sales*, 990 F.Supp. 1344, 1351–1354 (M.D.Ala.1998), *aff'd*, 163 F.3d 1361 (11th Cir.1998) (Table). However, state agency law is preempted by ERISA. § 1144(a) ("the provisions of this title ... supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..."); *UNUM Life Ins. Co. v. Ward*, 526 U.S. 358, 364, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (holding that "California's agency law, ... does 'relate to' employee benefit plans, and therefore does not occupy ground outside ERISA's preemption clause.").[17] Plaintiff also asserted a state law negligence claim against the Union and the Fund in "negligently" failing to inform plaintiff of amendments and changes to the Plan which adversely impacted his maximum pension benefits (doc. 1–Complaint, Second Cause of Action).

The Eleventh Circuit has instructed that "state law claims 'relate to' an ERISA plan for preemption purposes 'whenever the alleged conduct at issue is intertwined with the refusal to pay benefits.'" *Hall v. Blue Cross/Blue Shield of Ala.*, 134 F.3d 1063, 1065 (11th Cir.1998). The Supreme Court has broadly interpreted the phrase "relate to" in ERISA's preemption clause so as to include any state law having "'a connection with or reference to'" an employee benefits plan. *Hall*, at 1065 (*quoting, New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).)

■ Addressing plaintiff's claims requires a comparison between the alleged agent's representations and the written Plan. Thus, ERISA preempts plaintiff's state law agency claim, *Hall*, at 1066,[18] which includes the negligence and wanton claims.

Even assuming *arguendo*, that the Union was a fiduciary of the Fund, and Mr. Rettig the Union's agent, Mr. Rettig's interpretation of the Plan would be unen-

17. The only reference to *UNUM Life Ins.*, in this Circuit is *Hamilton*, 217 F.3d at 1326 (claim of breach of fiduciary duty under ERISA). In *Hamilton*, the Eleventh Circuit noted that the employer had cited *UNUM Life Ins.*, "to distract" the Court. *Id.*

18. Even if, plaintiff's claim were not preempted by ERISA, plaintiff has failed to prove that Mr. Rettig was an agent of the Fund.

Under Alabama law, the test of agency is the right of control, whether exercised or not. *Brown v. Commercial Dispatch Publishing Co.*, 504 So.2d 245 (Ala.1987). For one to be an agent, the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, not only what shall be done, but how it shall be done. *Id.* at 246. "Control must be proven; and proof of control requires more than proof of a mere right to determine if the person claimed to be an agent is conforming to the requirements of a contract." *Malmberg v. American Honda Motor Co., Inc.*, 644 So.2d 888 (Ala.1994) ...

Under Alabama law, " 'apparent authority' is such authority as a principal knowingly permits an agent to assume or holds him

out as possessing." *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 267 (5th Cir.1981). The doctrine of apparent authority is based upon the actions of the principal, not those of the agent. *Malmberg*, 644 So.2d at 891. Apparent authority is created when the principal holds the agent out to a third party as having the authority upon which the agent acts, not upon what one thinks an agent's authority might be or what the agent holds out his authority to be. *Id.* For apparent authority, "either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such a belief ..." *Restatement (Second) of Agency* § 27 Comment (a) (1958). *Glass*, 990 F.Supp. at 1352–53. Plaintiff has presented no evidence reflecting the Fund's control over Mr. Rettig. There has been no evidence presented to show that the Fund held Mr. Rettig out, or intended to hold Mr. Rettig out, to plaintiff as having any authority from the Fund. The evidence merely reflects what plaintiff thought Mr. Rettig's authority was or what Mr. Rettig held out as his derived apparent authority. Thus, the evidence does not indicate any apparent authority delegated by the Fund to Mr. Rettig.

forceable under ERISA. *Franklin v. QHG of Gadsden, Inc.,* 127 F.3d 1024, 1029 (11th Cir.1997) (*citing Nachwalter v. Christie,* 805 F.2d 956 (11th Cir.1986)). In *Nachwalter,* the Eleventh Circuit stated that "[a] central policy goal of ERISA[,] ... to protect the interests of employees and their beneficiaries in employee benefit plans[,] ... would be undermined if [the court] permitted oral modifications." *Nachwalter,* 805 F.2d at 960.

■ Moreover, "there is no federal common law right to promissory estoppel under ERISA in cases involving oral amendments to or modifications of employee plans governed by ERISA ..." *Alday v. Container Corp. of America,* 906 F.2d 660, 666 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991) (*citing Nachwalter,* 805 F.2d at 960). The Eleventh Circuit has created a very narrow common law doctrine under ERISA for equitable estoppel. *Katz v. Comprehensive Plan Group Ins., Alltel,* 197 F.3d 1084, 1090 (11th Cir.1999). "It is only available when (1) the provisions of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning or effect, and (2) representations are made to the employee involving an oral interpretation [of the ambiguous portion] of the plan." *Katz,* at 1090; *Alday,* at 666.

■ Courts are reluctant to apply the estoppel doctrine to require the payment of pension funds, usually referring to the basic policy of protecting the actuarial soundness of pension plans. *Cleary v. Graphic Communications International Union Supplemental Retirement and Disability Fund,* 841 F.2d 444 (1st Cir.1988); *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2nd Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986). "[I]f such funds are too vital to allow plan trustees to obligate the fund through their representations, *a fortiori* union officials—who are not as clearly identified with pen-

sion funds as are trustees—should not be permitted to commit the funds to persons not entitled to them ..." *Chambless,* at 1041 (citations omitted). "Representations made by a union official, clearly contrary to the written fund rules, cannot be binding on the Fund." *Cleary,* 841 F.2d at 447. As such, Mr. Rettig's representations to plaintiff and any representations inferred by plaintiff through the Union's participation in the Fund are unenforceable.

Because the uncontroverted evidence reflects that the Union is not a fiduciary of the Fund as defined by ERISA, nor is its Business Manager a fiduciary. The uncontested evidence establishes that it is Mr. LeBlanc who administers the Plan; plaintiff did not name Mr. LeBlanc as a defendant in this action. Moreover, the Trustees are the ultimate determining body for Fund pension and disability benefits.

As such, this court finds that the Union is not a fiduciary as defined by ERISA and thus, is not subject to fiduciary liability under ERISA. The Union is not the proper party defendant to plaintiff's breach of fiduciary duty claim.

Post trial,[19] plaintiff brings to the court's attention *"Robert J. Harte v. Bethlehem Steel Corp; General Pension Board of the Bethlehem Steel Corp., et al.,* No. 98–2052 (filed February 29, 2000)." (doc. 73). However, this court's research reflects that after the Third Circuit entered the opinion, Bethlehem Steel petitioned for rehearing and rehearing en banc. The Third Circuit granted the petition for the panel rehearing so that it might clarify and narrow the opinion. *Harte v. Bethlehem Steel Corp.,* 214 F.3d 446, 450–451 (3rd Cir.2000) (claiming breach of fiduciary duty).

In *Harte,* the Third Circuit explained:

The Supreme Court has recognized that the contours of fiduciary duties must be defined by the courts in "devel-

---

**19.** All parties were invited to file post trial briefs. Briefs were filed by plaintiff (docs.73– 74) and by the Fund (doc. 70).

op[ing] a federal common law of rights and obligations under ERISA-regulated plans." ... In our own efforts to develop a federal common law of ERISA rights, we have held that administrators generally have a fiduciary duty "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." ... A misleading statement or omission by a fiduciary is actionable if "there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision ... This is an issue for the factfinder if reasonable minds can differ on whether a misleading statement or omission would affect a reasonable employee's retirement decision...."

*Harte,* at 451–52 (footnote and citations omitted). The Third Circuit concluded that

an administrator who does not inform a beneficiary that his employment is severed when he might predictably and reasonably presume, after reading the pertinent part of the plan, that he is still employed, *may* be held liable for a breach of fiduciary duty.

*Id.* at 453 (emphasis added). The Third Circuit added, pertinent hereto, that "although we focus on whether Bethlehem's failure to notify in this case might be actionable, we note that it could have fulfilled its duties by using clear language in the plan ..." *Id.*

Herein, plaintiff does not charge that the Plan provisions regarding a break in service and the effect thereof were ambiguous or subject to differing interpretations. Further, as noted herein, this court finds that Section 4.12 is not ambiguous.

Plaintiff merely argues that he was unaware of the provision, he was not prewarned of his break in service, and that the effects of the break in service provision were not proffered to him. The *Harte* case does not support plaintiff's argument. Although plaintiff raises the failure to inform argument, he has not asserted a viable breach of fiduciary claim.

Moreover, plaintiff's unawareness of Section 4.12, questionable in light of the fact that, although he claims having received nothing from the Fund but his annual earned credit statements, the evidence indicates that all members were sent information directly from the Fund and received information and notifications through the Fund—Union connection.

Under the particular circumstances and facts of this case, this court finds that neither the Union, nor the Fund, assuming *arguendo* that either could be considered a fiduciary of the Fund, had an affirmative duty to warn plaintiff personally in 1978, of a potential break in service, of the waiver provision, and of the past service credit provision, and to individually set out the effect of his particular break in service upon his potential future pension benefits.

### C. Count One of Amended Complaint: Claims Under ERISA

Pertinent hereto, ERISA provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan [and] to enforce his rights under the terms of the plan ..." § 1132(a)(1)(B); *Hamilton,* 217 F.3d at 1326; *Gulf Life Ins. Co. v. Arnold,* 809 F.2d 1520, 1524 (11th Cir.1987). Plaintiff seeks to recover benefits allegedly due him under the terms of his Plan, and to enforce his rights thereunder.

Pension plans are strictly regulated by ERISA and are subject to ERISA's vesting, participation, and minimum funding requirements. *Alday,* 906 F.2d at 663. There is no dispute herein as to the validity of the subject Plan under ERISA.

■ Plaintiff's claims are governed by ERISA even though some of the events giving rise to the cause of action occurred prior to January 1, 1975, ERISA's effective date. A cause of action under ERISA does not accrue until an application for employee benefits is denied. *Gulf Life,* 809 F.2d at 1524.

This court finds that plaintiff's claims accrued when his appeal of the denial of his application for disability benefits became final. The evidence establishes that plaintiff applied for disability pension benefits on December 28, 1993, his application was denied and on June 29, 1994, he appealed. By letter dated October 3, 1994, the Fund denied his appeal. Pursuant to Section 9.04, the appellate decision of October 3, 1994, constitutes a final decision. Thus plaintiff's claims accrued on October 3, 1994, well after ERISA's effective date.

The Supreme Court has ruled that review under the "arbitrary and capricious" standard in actions brought under § 1132(a)(1)(B) is appropriate when the plan's administrator exercises discretionary powers. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 114–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1559 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 38 (11th Cir.1989) ("actions must be reviewed *de novo* unless the plan expressly gives the administrator discretionary authority to make eligibility determinations or construe the plan's terms.").

Relying on *Firestone,* the Eleventh Circuit has set out three standards of review of administrative decision in cases alleging a denial of benefits under an ERISA-covered plan. *Whatley v. CNA Ins., Co.,* 189 F.3d 1310 (11th Cir.1999). "[A] *de novo* review where the plan does not grant the administrator discretion; ... arbitrary and capricious when the plan grants the administrator discretion; and ... height-

ened arbitrary and capricious where there is a conflict of interest." *Id.* at 1313. If the plan provides the administrator with such discretionary authority, "application of the more deferential arbitrary and capricious standard is appropriate." *Guy,* 877 F.2d at 39. It is uncontested herein that the "arbitrary and capricious" standard is the appropriate standard for review.

> In applying the arbitrary and capricious standard, "[the court's] role 'is limited to determining whether the ... interpretation [of the Plan] was made rationally and in good faith—not whether it was right.'" *Anderson v. Ciba–Geigy Corp.,* 759 F.2d 1518, 1522 (11th Cir.) (*quoting Griffis v. Delta Family–Care Disability,* 723 F.2d 822, 825 (11th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984)), *cert. denied,* 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985). Factors taken into account include "(1) uniformity of construction; (2) 'fair reading' and reasonableness of that reading; and (3) unanticipated costs."
>
> ...

*Id.* This court undertakes the following analysis mindful of the arbitrary and capricious standard.

1. *Plaintiff's Pension Benefits and Plaintiff's Break In Service.*

■ Plaintiff claims that his pension benefits should have been calculated from January 1957, when he first joined the Union and began paying Union dues.[20] This court finds that the Trustees determination that plaintiff had a permanent break in service which resulted in the loss

---

**20.** The Fund argues that plaintiff's claim for pension credit prior to 1978, should be rejected for failure to exhaust his administrative remedies as required by the Eleventh Circuit under *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 846 (11th Cir. 1990). It is well settled that a plaintiff in an ERISA action must exhaust available administrative remedies before suing in federal court. *Perrino v. Southern Bell Tel. & Tel. Co.,* 209 F.3d 1309, 1315 (11th Cir.2000) (*citing Curry,* 891 F.2d at 846–47).

Herein, the evidence establishes that plaintiff with the assistance of his brother, Thomas Deas, Esq., availed himself of the appellate procedures under the Plan and appealed the Fund's June 29, 1994 decision. By letter dated October 3, 1994, the Trustee's denied plaintiff's appeal; as noted, under Section 9.04, the denial constitutes a final decision. Defendant fails to point to any Plan provision which provides any further administrative remedial procedure of which plaintiff failed to utilize.

of his pension credits earned prior to the break was neither arbitrary, nor capricious. The break in service was determined by a rational reading of the express provisions of the Plan.

The Plan is clear in this regard. A break in service is unambiguously defined and the effect of a break in service is unambiguously delineated at Section 4.12. The Plan also allows for the years of poor employment opportunities (1973 through 1975) and reasonably provides for past service credit when accompanied with a quantum of future service credit.

The evidence clearly establishes, under a fair and reasonable reading of the Plan provisions that plaintiff experienced a permanent break in service as of December 31, 1978, earning less than the minimum requisite number of hours (435 per year) in 1975, 1976, 1977, and 1978, consecutively. Even applying the waiver provision for poor employment opportunities, Section 4.12(e)(4), plaintiff's pension status cannot be altered. Ms. Gochnauer stated that after applying the waiver provision, excepting 1975, plaintiff is still left with three consecutive one-year breaks in service (1976, 1977, and 1978, earning less than 435 hours of work each year) which constitutes a permanent break in service as defined under Section 4.12(d).

Plaintiff admits the break in service, but asks that his permanent break in service be overlooked by the Trustees in that he continued throughout his Union membership to pay his dues and maintain his membership-in-good-standing. However, plaintiff points to no provision within the Plan which allows for such consideration.

The evidence establishes that the Plan recognizes and considers members' longstanding relationships with their Union by affording members past service credit under Section 5.08, for work in the industry prior to 1969, when the Union joined the Fund. A member is eligible to retire on a vested pension, in pertinent part, if he has ten years of pension credit, five of which must be future service credit. Plaintiff was credited with twelve years of past service credit but, was four months short of the minimum requisite 60–months of future credit service needed under Section 5.08.

Section 4.12(f)(3) covers the effect of a permanent break in service. The provision expressly and unambiguously states that a permanent break in service results in the disregard of all pension credit earned prior to the break. Thus, plaintiff's admitted break which constituted a permanent break as defined, resulted in the permanent loss of all plaintiff's pension credit earned prior to the break effective December 31, 1978.

In this case, however harsh the result may seem, under the clear express language of Section 4.12, this court can only conclude that plaintiff's pension benefits were calculated under a rational and reasonable reading of Section 4.12, and with a good faith consideration of the one-year waiver provision and the past service credit provision. Thus, this court finds that the Fund's decision to calculate plaintiff's pension benefits from January 1, 1979, rather than from January, 1957, was neither arbitrary, nor capricious.

Post trial, plaintiff argues that Ms. Gochnauer's failure to treat Mr. Fisher's October 10, 1994 letter as an appeal was an arbitrary and capricious act (docs.73, 74). Plaintiff relies on the fact that the letter opens with the phrase "I am writing this letter on behalf of [plaintiff] to appeal ..." (Plaintiff's Ex. 10).

This court, after reviewing all the relevant evidence disagrees. The evidence reflects that plaintiff appealed the denial of his disability benefits and the determination that he had incurred a break in service on June 29, 1994, through his attorney Thomas Deas, and the appeal was denied on October 3, 1994. Pursuant to Plan 1994, Section 9.04, the October 3, 1994 denial of plaintiff's appeal constituted a final decision. The evidence established that there is no mechanism within the Plan to reopen a benefit application once a final decision is rendered. Mr. Fisher's "ap-

peal" offered no new or additional evidence in support of plaintiff's claim for disability pensions benefits, nor offered anything relevant to contradict the determination that plaintiff had incurred a break in service. Mr. Fisher's designation of the purpose of his letter as an appeal did not obligate the administrator to treat the letter as an appeal. The administrator is bound by the Plan provisions and to have treated Mr. Fisher's letter as an appeal would have been contrary to Section 9.04, and outside the usual practice adhered to pursuant to the Plan provisions.

Plaintiff also directs the court's attention to the fact that in her response letter to Mr. Fisher, Ms. Gochnauer refers to "[t]he Committee," when Ms. Gochnauer admits that Mr. Fisher's letter was never presented to the Appeals Committee. (*See* Plaintiff's Ex. 12). The evidence reflects that plaintiff's argument is based on a reference taken out of context.

The gist of Ms. Gochnauer's letter is strictly informational. She acknowledges receipt of Mr. Fisher's October 10, 1994 letter. Her reference to the Committee is in the past tense. Ms. Gochnauer's letter simply sets out a summary of the Plan rules regarding a break in service, and informs Mr. Fisher of the Committee's prior determination regarding plaintiff's pension application and the basis of that determination, i.e., the Committee's awareness of high unemployment in the industry and the waiver provision, and the effects of plaintiff's break in service. This court finds nothing misleading in Ms. Gochnauer's letter.

2. *Plaintiff's Disability Benefits.*

■ Plaintiff complains that his disability benefits were not awarded to him until the Social Security Administration declared him disabled. Plaintiff also claims that, once his disability pension benefits were awarded by the Fund, the disability pension should have been effective from November 15, 1993, the determinative date of disability set by the Social Security Administration, rather than March 1, 1996, the date designated by the Fund. As noted previously, this court must determine whether the Fund's decisions regarding plaintiff's disability pension were arbitrary and capricious. *Guy,* 877 F.2d at 39.

The uncontroverted evidence reflects that to be disabled under the Plan, plaintiff needed to be "permanently and totally disabled," "totally unable . . . to engage in or perform the duties of a Sheet Metal Worker or other employment in the construction industry . . ." Plan 1990, Section 5.11. The evidence establishes that plaintiff was not totally or permanently disabled at the time he applied for disability pension benefits.

Plaintiff's own orthopaedic surgeon did not deem plaintiff totally disabled. Dr. Park referenced plaintiff's condition as a "possible disability" (Plaintiff's Ex. 3), and indicated that plaintiff had diseased knees resulting from an occupational hazard, and to mitigate the "rapid progression" of the disease, plaintiff needed to avoid certain behaviors, e.g., knee bends and climbing. Dr. Park noted that plaintiff "probably eventually" would need knee replacements, but "[j]ob modification [was] more important than anything else." (Plaintiff's Ex. 2, 3). The evidence does not reflect that plaintiff ever requested job modification; plaintiff sought a disability pension.

Based on the medical evidence and Dr. Levy's review, plaintiff's disability pension was denied on June 2, 1994. Plaintiff was not deemed permanently and totally unable to perform any employment in the industry. Plaintiff appealed the decision; the appeal was denied and the decision became final pursuant to Section 9.04.

This court finds that the Plan criteria regarding eligibility for disability pension benefits is clear and the pertinent provisions were rationally applied under a fair reading. This court finds nothing arbitrary in the June 2, 1994 denial of disability pension benefits.

Post trial, plaintiff contends that Dr. Park had wanted a "functional capacities form" completed to evaluate plaintiff's

functional limitations. The evidence shows that Dr. Park had only suggested a functional capacity evaluation be conducted.

Plaintiff also argues that once he was deemed disabled by Social Security, and the Fund amended the Plan to accept his Social Security disability as proof of disability under the Plan, his benefits should have been calculated retroactively from November 15, 1993, the Social Security on set date. However, the evidence establishes that plaintiff did not fulfill the express and unambiguous Plan requirement, i.e., file written proof of his disability, until January 29, 1996, over a year after he was deemed disabled by the Social Security Administration. The Fund received plaintiff's proof of disability in February, 1996, and pursuant to Section 9.04, treated the notice as a new application for disability benefits. Plaintiff was awarded benefits effective March 1, 1996, the month following the month in which proof of disability was received pursuant to Plan 1994, Sections 5.04, 9.01, and 9.05(a).

Although plaintiff argues that his disability pension should be implemented retroactively, plaintiff points to no Plan provision which would have allowed for it. Moreover, the evidence reflects that there is no provision for retroactive implementation of pension benefits.

### D. Count Three of the Amended Complaint: Claim for Attorney's Fees Under ERISA

This is moot, inasmuch as the court has denied relief under ERISA.

### III. Conclusion

This court finds that for the reasons set forth, the determination of plaintiff's pension benefits and plaintiff's disability benefits were neither arbitrary, nor capricious, nor should benefits awarded be made retroactive to November 15, 1993. Therefore, it is hereby ORDERED that judgement be entered in favor of defendants, the Sheet Metal Workers National Pension Fund and the Sheet Metal Workers' International Association Local Union # 441 on all counts, and against plaintiff Samuel W. Deas.